FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING
2019 JUL 15 PM 2: 06
STEPHAN HARRIS, CLERK
CHEYENNE

UNITED STATES DISTRICT COURT
DISTRICT OF IDAHO

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT; and CENTER FOR BIOLOGICAL DIVERSITY,<br><br>Plaintiffs,<br><br>vs.<br><br>DAVID BERNHARDT, Secretary of Interior; and UNITED STATES BUREAU OF LAND MANAGEMENT, an agency of the United States,<br><br>Defendants,<br><br>STATE OF WYOMING; WESTERN ENERGY ALLIANCE; and JONAH ENERGY LLC,<br><br>Defendant-Intervenors. | Case No.: 1:18-cv-00187-REB  19-CV-146-S<br><br>MEMORANDUM DECISION AND ORDER RE:<br><br>DEFENDANT-INTERVENOR JONAH ENNERGY LLC'S MOTION TO DISMISS OR IN THE ALTERNATIVE TO TRANSFER<br>(Docket No. 96)<br><br>DEFENDANT-INTERVENOR STATE OF WYOMING'S MOTION TO DISMISS OR IN THE ALTERNATIVE TO TRANSFER<br>(Docket No. 97)<br><br>FEDERAL DEFENDANTS' MOTION TO DISMISS FOR IMPROPER VENUE OR, IN THE ALTERNATIVE TO SEVER AND TRANSFER<br>(Docket No. 99)<br><br>DEFENDANT-INTERVENOR WESTERN ENERGY ALLIANCE'S MOTION TO DISMISS<br>(Docket No. 100) |

Pending before the Court are the following motions: (1) Defendant-Intervenor Jonah Energy LLC's Motion to Dismiss or in the Alternative to Transfer (Dkt. 96); (2) Defendant-Intervenor State of Wyoming's Motion to Dismiss or in the Alternative to Transfer (Dkt. 97); (3) Federal Defendants' Motion to Dismiss for Improper Venue or, in the Alternative, to Sever and Transfer (Dkt. 99); and (4) Defendant-Intervenor Western Energy Alliance's Motion to Dismiss (Dkt. 100). Having carefully considered the record, participated in oral argument, and otherwise being fully advised, the Court enters the following Memorandum Decision and Order:

MEMORANDUM DECISION AND ORDER - 1

Certified to be a true and correct copy of original filed in my office.
Stephen W. Kenyon, Clerk
United States Courts, District of Idaho
By: _____ 7/10/19
Deputy   Dated

## I. BACKGROUND

The Court has previously described the general contours of this case. *See* (Dkts. 54, 66, 74, 111). Plaintiffs Western Watersheds Project ("WWP") and Center for Biological Diversity ("CBD") (collectively "Plaintiffs" or "WWP") allege that agency actions of the Department of Interior unlawfully promote and expedite oil and gas leasing on public lands and "will adversely impact essential habitats and populations across the range of the greater sage-grouse . . ., and violate bedrock environmental laws including the Federal Land Policy and Management Act ("FLPMA"), the National Environmental Policy Act ("NEPA"), and the Administrative Procedure Act ("APA")." First Am. Compl., ¶ 1 (Dkt. 78). Plaintiffs contend that certain national policy directives and oil and gas leasing and development approvals "systematically disregard the 2015 Sage-Grouse Plan Amendments and ignore cumulative adverse effects to sage-grouse across the Interior West." Pls.' Resp. to Mots. to Dismiss, p. 1 (Dkt. 106).

One such "agency action" is the Normally Pressured Lance Natural Gas Development Project ("NPL Project"). Defendant-Intervenor Jonah Energy LLC ("Jonah") is the proponent of the NPL Project and sought Bureau of Land Management ("BLM") approval to conduct full-field development of natural gas and condensate resources from existing state and federal oil and gas leases in an area wholly within Sublette County, Wyoming.[1] *See* Mem. ISO Mot. to Interv., p. 2 (Dkt. 85-1). Jonah owns the leasing comprising the NPL Project area which is located on lands and minerals administered by the BLM (135,655 surface acres or 96.3% of the NPL Project area), the State of Wyoming (5,123 surface acres or 3.6% of the NPL Project area), and private lands (81 acres or 0.06% of the NPL Project area) in Sublette County. *See id.* The BLM issued its Record of Decision for the NPL Project ("ROD") on August 27, 2018, allowing Jonah

---

[1] Sublette County is a sparsely populated county in west-central Wyoming. Its county seat is Pinedale.

MEMORANDUM DECISION AND ORDER - 2

to submit sit-specific applications for natural gas drilling and related development on federal lands within the NPL Project area – specifically, Jonah can submit applications for permits to drill and related rights-of-way for as many as 3,500 natural gas wells, associated infrastructure, and ancillary facilities, resulting in up to 350 wells site-specifically approved per year during the NPL Project's approximate 10-year development period. *See id.* at pp. 2-3.

The First Amended Complaint (1) specifically added the NPL Project in the "Final Actions" collectively challenged in the First, Second, and Third Claims for Relief,[2] and (2) added a new Seventh Claim for Relief alleging that the NPL's Final Environmental Impact Statement ("FEIS") and ROD were deficient under FLPMA, NEPA, and the APA. *See* First Am. Compl., ¶¶ 1a, 12, 122, 225mm-225mmm, 332-343 (Dkt. 78). Plaintiffs seek to reverse and remand the BLM decisions reflected by the FEIS and ROD for the NPL Project. *See id.* at p. 121.

Jonah, Defendant-Intervenors State of Wyoming ("Wyoming") and Western Energy Alliance ("WEA"), and Defendants David Bernhardt and the BLM (collectively "Federal Defendants") move under FRCP 12(b)(3) to dismiss Plaintiffs' claims challenging the NPL Project, arguing that venue is not proper in this District under 28 U.S.C. § 1391(e). Alternatively, they request that Plaintiffs' NPL Project claims be severed and transferred to the District of Wyoming under FRCP 21 and 28 U.S.C. § 1404(a).

## II. DISCUSSION

At the outset, Jonah, Wyoming, the Federal Defendants, and WEA move to dismiss Plaintiffs' NPL Project-related claims for improper venue pursuant to FRCP 12(b)(3). Once

---

[2] The BLM's August 27, 2018 ROD formally approved the NPL Project, prompting the transition of the NPL Project from the group of "Pending Actions" referenced in Plaintiffs' original Complaint to the group of "Final Actions" challenged in Plaintiffs' First Amended Complaint. *Compare generally* Compl. (Dkt. 1), *with* First Am. Compl. (Dkt. 78).

**MEMORANDUM DECISION AND ORDER - 3**

challenged, a plaintiff bears the burden of showing that venue is proper in the instant forum. *See Schenck v. Motorcycle Accessory Warehouse, Inc.*, 2007 WL 1138915, *1 (D. Idaho 2007) (citing *Piedmont Label Co. v. Sun Garden Packing Co.*, 598 F.2d 491, 496 (9th Cir. 1979)); *see also, e.g.*, 14D Wright & Miller, Federal Practice & Procedure § 3808 (4th ed.) (in actions with multiple claims, plaintiff must show that venue is proper for each claim). If a plaintiff sues in a district in which venue is not proper, the court will (upon timely motion) dismiss the action for improper venue, or transfer the case to any district where it could have been brought "if it be in the interest of justice." 28 U.S.C. § 1406(a).

A lawsuit against an officer or employee of the United States or a federal agency may be brought in any judicial district in which "(A) a defendant in the action resides, (B) a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (C) the plaintiff resides if no real property is involved in the action." 28 U.S.C. § 1391(e)(1)(A-C). WWP resides in Idaho; hence, venue is proper in this District under § 1391(e)(1)(C) *if* no "real property" is involved with regard to Plaintiffs' claims concerning the NPL Project – that is, no Defendant resides in Idaho under § 1391(e)(1)(A), and it cannot be said that a substantial part of the events/omissions giving rise to Plaintiffs' NPL-related claims occurred in Idaho, or that a substantial part of the NPL Project area that is the subject of Plaintiffs' claims is situated in Idaho under § 1391(e)(1)(B).

The Court has previously considered venue motions in this case, specifically whether Plaintiffs' (still ongoing) dispute over the way oil and gas lease sales are handled on public lands involves real property under § 1391(e)(1)(C). The Court ruled that such a challenge did not "relate to matters of right, title, and interest" and thus did not implicate real property for venue purposes. *See* 9/4/18 MDO, p. 10 n.7 (Dkt. 66) (citing *WWP v. Salazar*, 2009 WL 1299626, *2 (D. Idaho 2009)). Without conceding the point, Jonah, Wyoming, the Federal Defendants, and

MEMORANDUM DECISION AND ORDER - 4

WEA now argue that Plaintiffs' recent challenge to the NPL Project is distinguishable. The Plaintiffs' NPL claim, they argue, centers on real property because it involves only the BLM's approval of a discrete oil and gas development project located entirely in Wyoming. *See* Jonah's Mem. ISO Mot. to Dismiss, pp. 6-8 (Dkt. 96-1); Wyoming's Mem. ISO Mot. to Dismiss, p. 13 (Dkt. 97-1); Fed. Defs.' Mem. ISO Mot. to Dismiss, pp. 5-9 (Dkt. 99-1); WEA's Mot. to Dismiss (Dkt. 100) (joinder). Plaintiffs disagree, responding that their claims relative to the NPL Project are independent of and will not adjudicate Jonah's right or title to any underlying mineral leases; instead, they seek to ensure that the BLM complies with its NEPA and FLPMA obligations in managing oil and gas development/operations in the NPL Project area. *See* Pls.' Resp. to Mots. to Dismiss, pp. 6-12 (Dkt. 106).

Untangling these arguments is not a straightforward exercise. Though there is a difference between Plaintiffs' claims surrounding the NPL Project on the one hand and those speaking to the BLM's oil and gas leasing policy on public lands affecting sage-grouse habitat/populations on the other hand (*see infra*), whether the former claims involve real property as contemplated by § 1391(e)(1)(C) is not obvious. Regardless, a definitive answer is not required here, because the Court must decide whether to transfer Plaintiffs' NPL Project-related claims even if the claims do not involve real property. In other words, even if venue is proper in the District of Idaho, the Court must still take up the requests made by Jonah, Wyoming, the Federal Defendants, and WEA to sever the claims under FRCP 21 and transfer them to Wyoming federal court under 28 U.S.C. § 1404(a). And, even if venue is improper in the District of Idaho, the Court would consider, as an alternative to dismissal, whether the NPL claims should be transferred under 28 U.S.C. § 1406(a) to any district in which they could have been brought "if it be in the interest of justice." Whether claims are dismissed or transferred under § 1406(a) is discretionary, but generally transfer is preferred over dismissal, recognizing that "[t]he 'interest

**MEMORANDUM DECISION AND ORDER - 5**

of justice' language acts as a limitation on transfer." *Reilly v. Levin*, 2015 WL 13236640, *8 (D. Idaho 2015) (citing *Minnette v. Time Warner*, 997 F.2d 1023, 1026-27 (2d Cir. 1993); *Nichols v. G.D. Searle & Co.*, 991 F.2d 1195, 1201 (4th Cir. 1993)).

For the reasons described below, the Court concludes that Plaintiffs' claims over the NPL Project should be transferred to Wyoming federal court. Therefore, the Court does not speak to the propriety of asserting such claims in this District in the first instance – that question need not be answered considering the other factors at play.

### A. Plaintiffs' NPL Project Claims Are Severed

Severance is a preliminary procedural step in cases where a court intends to transfer only a part of a larger action. Because 28 U.S.C. § 1404(a) "authorizes the transfer only of an entire action and not of individual claims," a court may properly sever certain claims, create "two or more separate 'actions,'" and then "transfer certain of such separate actions while retaining jurisdiction of others." *Wyndham Assocs. v. Bintliff*, 398 F.2d 614, 618 (2d Cir. 1968); *see also* 7 Wright & Miller, Federal Practice & Procedure § 1689 (3rd ed.) ("Even when venue is proper as to all defendants, the court may sever a claim against a party and transfer it to a more convenient forum or sever an unrelated claim and give it separate treatment when doing so would be in the interest of some or all of the parties.").

Even when different claims are otherwise properly joined in a single case, a trial court has the authority to sever "any claim against a party." Fed. R. Civ. P. 21. There is broad discretion in deciding whether to sever claims that are "discrete and separate," but a court will abuse its discretion if the severance separates an otherwise "essentially unitary problem." *Rice v. Sunrise Express, Inc.*, 209 F.3d 1008, 1016 (7th Cir. 2000)); *see also Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1297 (9th Cir. 2000) (noting that district courts "possess broad discretion . . . to make a decision granting severance."); 7 Wright & Miller, Federal Practice & Procedure

**MEMORANDUM DECISION AND ORDER - 6**

§ 1689 (3rd ed.) ("Questions of severance are addressed to the broad discretion of the district court.").

Hence, "[p]articular claims may be severed from the main action and proceeded with separately, where the asserted right to relief does not arise out of or relate to the same transaction or occurrence or there is no question of law or fact common to the parties." *Green Meadows Partners LLP v. Tomkinson*, 2006 WL 6885989, *1 (C.D. Cal. 2006) (internal quotation marks and citations omitted). Even where the claims are based on the same transaction or occurrence and involve common legal and factual questions, the court still may sever claims for purposes of convenience, to avoid prejudice, or to promote the expeditious resolution of the litigation. *See Ferger v. C.H. Robinson Worldwide, Inc.*, 2006 WL 2091015, *1 (W.D. Wash. 2006).

Federal Defendants[3] argue that "[s]everance of the NPL Project claim is appropriate because that claim relates specifically to a discrete oil and gas project in Wyoming and therefore is factually and legally distinct from Plaintiffs' other claims . . . . Unlike the other claims, the NPL Project claim is a challenge to a distinct project based on specific allegations regarding the planning and NEPA process for that project." Fed. Defs.' Mem. ISO Mot. to Dismiss, p. 11 (Dkt. 99-1). Plaintiffs counter that, despite the NPL Project's existence, common questions of law and fact predominate between it and the lease sale claims. *See* Pls.' Resp. to Mots. to Dismiss, pp. 12-13 (Dkt. 106) ("[I]n approving each lease sale or development project, including NPL, BLM failed to heed the 'prioritization' directive under the 2015 Sage-Grouse Plan

---

[3] Of the various defendant parties, only Federal Defendants formally seek to sever Plaintiffs' NPL Project claims under FRCP 21 before transferring them via 28 U.S.C. § 1404(a). *See generally* Fed. Defs.' Mem. ISO Mot. to Dismiss, pp. 10-11 (Dkt. 99-1); *but see* WEA's Mot. to Dismiss (Dkt. 100) (joining in Federal Defendants' arguments). Even so, each such defendant party argues that Plaintiffs' NPL Project claims should be transferred to the District of Wyoming (if not dismissed (*see supra*)) and the Court's analysis of *that* issue necessarily incorporates the factors relevant to a predicate severance analysis. *See infra*. In short, if Plaintiffs' NPL Project claims are transferred, severance of those claims is similarly appropriate.

**MEMORANDUM DECISION AND ORDER - 7**

Amendments, in violation of FLPMA and the APA (Claim One); failed to follow the best available sage-grouse science, in violation of FLPMA and the APA (Claim Two); and failed to study cumulative effects of oil and gas development on sage-grouse or reasonable management alternatives, in violation of NEPA and the APA (Claim Three). These claims are predicated on common factual and legal issues, including the meaning of the prioritization directive and impacts to sage-grouse associated with oil and gas development."); *but see infra* (comparing Plaintiffs' NPL Project claims with balance of lease sale claims).

There are similarities and some overlap between such circulating claims, but one set (the NPL Project claims) is not like the rest. While the NPL Project claims could be viewed as collapsing into Plaintiffs' essential allegations, the factual backdrop to those claims (as well as defenses) is unique to the NPL Project in ways that do not apply to the lease sale claims. There is a fundamental difference between *leasing* decisions and project-level decisions that actually authorize oil and gas *development*. Different primary decision-makers are involved, considering different regulatory variables, leading to what are intended to be customized decisions and end-results. Together, these considerations reveal that Plaintiffs' NPL Project claims are substantively different than leasing decisions and the totality of Plaintiffs' claims does not represent an "essentially unitary problem." The Court therefore exercises its discretion to sever Plaintiffs' NPL Project claims.[4]

---

[4] To be clear, *all* of Plaintiffs' NPL Project-related claims are severed, including those contained within the First Amended Complaint's First, Second, and Third Claims for Relief, recognizing that all of the claims challenging the NPL Project are duplicated in the Seventh Claim for Relief. *Compare* First Am. Compl. ¶¶ 276-307 (Dkt. 78) (discussing "prioritization," best available sage-grouse science, and cumulative effects of oil and gas development on sage-grouse and management alternatives within First, Second, and Third Claims for Relief), *with id.* at ¶¶ 332-343 (discussing same in Seventh Claim for Relief). Moreover, the Seventh Claim for Relief raises additional NEPA and FLPMA violations pertaining to the NPL Project which other Claims for Relief do not. *See id.* at ¶ 340-341. Therefore, severing the Seventh Claim for Relief effectively severs all of Plaintiffs' NPL claims.

**MEMORANDUM DECISION AND ORDER - 8**

**B. Plaintiffs' NPL Project Claims Are Transferred to the District of Wyoming**

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a). The statute allows for such a transfer "to prevent the waste of time, energy and money and to protect litigants, witnesses, and the public against unnecessary inconvenience and expense." *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964) (internal quotation marks and citation omitted). The party seeking the transfer bears the burden of demonstrating that the transferee district is a "more appropriate forum." *Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 499 (9th Cir. 2000). Motions to transfer venue lie within the broad discretion of the district court and must be determined on an individualized basis. *See id.* at 498.

There are two steps in making that decision. First, the Court must decide whether the case could have been brought in the forum to which the transfer is sought – meaning the proposed transferee court has jurisdiction and venue is proper there. *See* 28 U.S.C. § 1404(a); *Hatch v. Reliance Ins. Co.*, 758 F.2d 409, 414 (9th Cir. 1985). If so, the second step calls for a case-specific analysis that balances the plaintiff's interest in choosing a forum against the aggregate considerations of convenience and the interest of justice/fairness. *See Steward Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988); *Jones*, 211 F.3d at 498-99. Among the private-interest and public-interest factors for the court to consider are: (1) plaintiff's choice of forum; (2) convenience of the parties; (3) convenience of the witnesses; (4) ease of access to the evidence; (5) familiarity with the applicable law; (6) feasibility of consolidation with other claims; (7) any local interest in the controversy; and (8) the relative court congestion and time [to] trial in each forum. *See Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 843 (9th Cir. 1986).

**MEMORANDUM DECISION AND ORDER - 9**

On balance, these factors justify transfer of Plaintiffs' NPL Claims to the District of Wyoming, as explained to follow.

1. Step One: Where the Action Might Have Been Brought

"In determining whether an action 'might have been brought' in a district, the court looks to whether the action initially could have been commenced in that district." *Hatch*, 758 F.2d at 414 (quoting 28 U.S.C. § 1404(a)). As a threshold matter, Plaintiffs do not dispute that, under 28 U.S.C. § 1391(e), they could have brought their NPL claims in the District of Wyoming. *See, e.g.*, Pls.' Resp. to Mots. to Dismiss, pp. 15-20 (Dkt. 106) (only addressing factors involving transfer analysis, not issue of venue in District of Wyoming itself).[5] Therefore, the Court turns to the parties' other arguments regarding transfer under § 1404(a).

2. Step Two: Convenience and the Interest of Justice

Environmental cases such as this one typically are "resolved by the court examining the administrative record to decide cross-motions for summary judgment . . . . There are no witnesses to consider, and documentary evidence is as easily provided in one venue as another, especially in this age of electronic transmission." *Ctr. for Biological Diversity v. Kempthorne*,

---

[5] The Court agrees. Wyoming is a proper venue for Plaintiffs' NPL Project claims because, at the very least, "a substantial part of the events or omissions giving rise" to the claims took place in Wyoming. 28 U.S.C. § 1391(e)(1)(B); *see* Fed. Defs.' Mem. ISO Mot. to Dismiss, pp. 13-14 (Dkt. 99-1) (noting that approval process involved consultation with State of Wyoming (including appropriate state agencies), several Wyoming counties, and Town of Pinedale, Wyoming, participating as "cooperating agencies" during NEPA process; NEPA process involved consultation with several tribes in region; BLM's Pinedale and Rock Springs Field Offices (both located in Wyoming) prepared Draft Environmental Impact Statement ("DEIS") and FEIS; all public meetings on NPL Project were held in Wyoming (Pinedale, Rock Springs, and Marbleton); more than two-thirds of public scoping comments submitted on NPL Project in 2011 originated in Wyoming (including those comments submitted by WWP); BLM's Wyoming State Director, Mary J. Rugwell made decision to approve NPL Project and signed all Federal Register notices related to NPL Project; and NPL Project itself is located entirely within Wyoming, covering approximately 141,000 acres in BLM's Pinedale and Rock Springs Field Offices); *see also* Jonah Mem. ISO Mot. to Dismiss, pp. 6-8 (Dkt. 96-1).

MEMORANDUM DECISION AND ORDER - 10

2007 WL 2023515, *5 (N.D. Cal. 2007) (internal quotation marks omitted).[6] Further, because all federal courts are competent to decide federal issues correctly, coupled with the fact that this Court has been actively involved in the case since its inception in April 2018 (though largely in matters preceding Jonah's intervention), there is no reason to conclude that transfer from the District of Idaho to the District of Wyoming will assist with relative court congestion and the time to trial. *See* 9/4/18 MDO, pp. 11-12 (Dkt. 66). In sum, the convenience factors are basically neutral, distilling the Court's focus down to the strain between Plaintiffs' choice of forum in Idaho and Wyoming's more localized interest in the NPL Project.

In that regard, while substantial deference is typically given to Plaintiffs' choice of forum, there is less reason for such deference when "the operative facts have not occurred within the forum of original selection and that forum has no particular interest in the parties or the subject matter." *Pacific Car and Foundry Co. v. Pence*, 403 F.2d 949, 954 (9th Cir. 1968); *see also Klamath Tribes v. U.S. Bureau of Reclamation*, 2018 WL 3570865, *7 (N.D. Cal. 2018) ("However, even if venue is proper here, when the environmental impact alleged is not in the district chosen and defendants move to transfer to the affected area, then plaintiff's chosen forum

---

[6] Plaintiffs argue that transferring the NPL Project claims to Wyoming would "saddle [them] with a greater burden, expense, and delay of litigating a second case outside their home forum" and require them to "have to locate and engage local counsel in the District of Wyoming, and expand far more staff time and attorney resources in traveling to Wyoming district court." Pls.' Resp. to Mots. to Dismiss, p. 13 (Dkt. 106); *see also Decker Coal*, 805 F.2d at 843 (transfer is not appropriate under § 1404(a) where it "would merely shift rather than eliminate the inconvenience"). Inconvenience for Plaintiffs' *attorneys*, however, is arguably a non-issue. *See Ctr. for Biological Diversity v. Rural Utilities Serv.*, 2008 WL 2622868, *1 (N.D. Cal. 2008). Still, WWP (the only Plaintiff with a residence in Idaho) and CBD have been litigants in the District of Wyoming in several cases over the years. *See* Wyoming's Reply ISO Mot. to Dismiss, p. 9 (Dkt. 109) (identifying "active cases" in District of Wyoming involving Plaintiffs). And, to the extent witnesses are needed moving forward, the Court notes that (1) its Pocatello courthouse is actually closer to Pinedale and Rock Springs, Wyoming than is the federal courthouse in Cheyenne, Wyoming and (2) the Pocatello courthouse is roughly equidistant with the federal courthouse in Casper, Wyoming. All this is to say that the convenience factors are not so strong as to favor venue in either Idaho or Wyoming.

MEMORANDUM DECISION AND ORDER - 11

is given less consideration.") (citing *Sierra Club v. U.S. Defense Energy Support Ctr.*, 2011 WL 89644, *3 (N.D. Cal. 2011) (giving chosen forum little weight because "the underlying action is not connected to the Northern District of California."); *Sierra Club v. U.S. Dep't of State*, 2009 WL 3112102, *3 (N.D. Cal. 2009) (giving chosen forum little weight when none of operative facts occurred within district and district had little interest in parties or subject matter)).

Here, the only connection between the portion of this lawsuit relating to the NPL Project and the District of Idaho is WWP's residence in Hailey, Idaho. In stark contrast, the NPL Project's very existence is inextricably linked to Wyoming. For example:

- The NPL Project is in Wyoming. *See supra.*

- Public lands within the NPL Project area are managed by the BLM's Pinedale and Rock Springs, Wyoming Field Offices. *See* Ulrich Decl., ¶ 7 (Dkt. 96-2). Policies and guidelines for development within the NPL Project area are contained in the Pinedale and Green River Resource Management Plans ("RMPs") and RODs. *See* Rugwell Decl., ¶ 4 (Dkt. 99-7).

- Planning for the NPL Project took place in Wyoming. *See id.* at ¶ 5.

    o The BLM signed memoranda of understanding ("MOU") with nine agencies that worked as cooperating agencies during the preparation of the NPL Project Environmental Impact Statement ("EIS"): (1) the U.S. Environmental Protection Agency; (2) Lincoln County, Wyoming; (3) Lincoln County Conservation District; (4) Wyoming (and "all appropriate state agencies"); (5) Sublette County, Wyoming; (6) Sublette County Conservation District; (7) Sweetwater County, Wyoming; (8) Sweetwater County Conservation District; and (9) Pinedale, Wyoming. *See id.*; *see also* NPL Project ROD, p. 34 (Dkt. 99-2).

    o On April 12, 2011, BLM published the Notice of Intent to prepare an EIS for the NPL Project in the *Federal Register* (76 Fed. Reg. 20370) and held three scoping meetings May 2-4, 2011 in Pinedale, Marbleton, and Rock Springs, Wyoming. *See* Rugwell Decl., ¶ 7 (Dkt. 99-7); *see also* NPL Project ROD, p. 36 (Dkt. 99-2).

    o On July 7, 2017, a Notice of Availability for the DEIS for the NPL Project was published in the *Federal Register* (76 Fed. Reg. 31628) and the BLM held public meetings in the Pinedale, Wyoming Field Office on July 25, 2017 and the Rock Springs, Wyoming Field Office on July 26, 2017. *See id.*

MEMORANDUM DECISION AND ORDER - 12

- o On June 22, 2018, a Notice of Availability for the FEIS for the NPL Project was published in the *Federal Register* (76 Fed. Reg. 20370). *See* Rugwell Decl., ¶ 8 (Dkt. 99-7); *see also* NPL Project ROD, p. 37 (Dkt. 99-2). The BLM received comments on the FEIS from one federal government entity, three Wyoming government entities, two local government entities, and four interest groups or businesses, which the BLM considered when preparing the NPL Project ROD. *See id.*

- o On August 27, 2018, the BLM Wyoming State Director, Mary Jo Rugwell, signed the NPL Project ROD, approving the NPL Project. *See* NPL Project Rod, p. 1 (Dkt. 99-2).

- The NPL Project is subject to, and implemented in accordance with, approved land use plans that have incorporated Wyoming's Core Area Protection Strategy ("CAS"), including the Pinedale and Green River RMPs/RODs and Approved Resource Management Plan Amendments ("ARMPA") for the Rocky Mountain Region. *See* NPL Project ROD, p. 3 (Dkt. 99-2); *see also* Ulrich Decl., ¶¶ 32-34, 39 (Dkt. 96-2).

  - o Initially developed in 2008 by the Sage-Grouse Implementation Team ("SGIT"),[7] the CAS represents Wyoming's template for managing greater sage-grouse by (1) identifying and protecting sage-grouse priority habitat areas ("Core Population Areas") through a series of stipulations that avoid and minimize impacts to greater sage-grouse within such Core Population Areas, and (2) utilizing compensatory mitigation as a conservation strategy when avoidance and minimization measures are inadequate to protect Core Population Areas. *See* Ulrich Decl., ¶¶ 13-26, 29 (Dkt. 96-2); *see also* Executive Order 2015-4, attached as Ex. 4 to Ulrich Decl. (Dkt. 96-6)

---

[7] Consisting of 16 members in 2007 (later expanded to 24 members), the SGIT is composed of a variety of governmental and stakeholder interests, including (1) state/local government/agencies (Governor's Office, Wyoming House of Representatives and Senate, Wyoming Game and Fish Department ("WGFD"), Department of Environmental Quality, Oil and Gas Conservation Commission, Office of State Lands, Department of Agriculture, and Department of Transportation, Wyoming Wildlife and Natural Resource Trust Fund Board, and county commissioners), (2) federal agencies (BLM, U.S. Fish and Wildlife Service ("USFWS"), U.S. Forest Service ("Forest Service"), and Natural Resources Conservation Service), and (3) non-governmental representatives (oil and gas, mining, wind energy/transmission, and agricultural industries and conservation citizen groups). *See* Ulrich Decl., ¶ 15 (Dkt. 96-2) (Paul Ulrich serves as one of two oil and gas industry representatives on SGIT and is Jonah's Director of Government Relations); *see also generally* Wyo. Stat. Ann. § 9-19-101 (discussing SGIT membership and how SGIT shall "review data and make recommendations to the governor regarding actions and funding to maintain and enhance sage grouse populations and sage grouse habitats in Wyoming" and "make recommendations to the governor regarding regulatory actions necessary to maintain and enhance sage grouse populations and sage grouse habitats in Wyoming.").

**MEMORANDUM DECISION AND ORDER - 13**

(Executive Order from then-Wyoming Governor Matthew H. Mead (replacing Executive Orders 2011-5 and 2013-3), identifying Wyoming's CAS as "the State of Wyoming's primary regulatory mechanism to conserve the Greater sage-grouse . . . .").

- o In July 2010, the Wyoming legislature adopted a joint resolution endorsing the CAS. *See* Ulrich Decl., ¶ 24 (Dkt. 96-2).[8]

- o In September 2015, the BLM and Forest Service completed their National Greater Sage-Grouse Planning Strategy, which amended 98 BLM Resource Management Plans ("RMPs"), including the Pinedale RMP and Green River RMP – these amendments represent the ARMPA. *See* First Am. Compl., ¶¶ 4, 49 (Dkt. 78).

- o The ARMPA "provides specific goals, objectives, management actions, and required design features for the conservation of Greater Sage-Grouse in Wyoming." ARMPA, App. D, p. 136, attached as Ex. 12 to Ulrich Decl. (Dkt. 96-14).

- o The ARMPA endorsed, and largely adopted the CAS. *See* ARMPA, pp. 20-21, attached as Ex. 12 to Ulrich Decl. (Dkt. 96-14) ("The ARMPA is built upon the foundation for GRSG [(greater sage-grouse)] management established by and complementary to the Governor's Executive Order 2011-05, Greater Sage Grouse Core Area Protection (Core Area Strategy), State of Wyoming Executive Department (2011), by establishing similar conservation measures and focusing restoration efforts in the same key areas most valuable to the GRSG."); *see also* ARMPA ROD, p. 1-30, attached as Ex. 13 to Ulrich Decl. (Dkt. 96-15) ("This ROD approves three RMPs – Buffalo, Cody and Worland – and an amendment to six RMPs (Wyoming RMPA). All of the Wyoming plans are built on the foundation for GRSG management established by and complementary to the Governor's Executive Order 2011-05, Greater Sage-Grouse Core Area Protection (Core Area Strategy; Wyoming Office of the Governor 2011) and updated Executive Order (2015-4), by establishing similar conservation measures and focusing restoration in the same key areas most valuable to GRSG."); ARMPA, App. D, p. 136, attached as Ex. 12 to Ulrich Decl. (Dkt. 96-14) ("The measures identified in the ARMPA have been developed in coordination with not just the USFWS, but also the State of Wyoming, including the Wyoming Game and Fish Department, and local cooperating

---

[8] In 2012, this Court recognized (after an evidentiary hearing) that "[t]he CAS is a serious and coordinated effort by stake holders in Wyoming to counter the effects of drilling." *WWP v. Salazar*, 2012 WL 5880658, *7 (D. Idaho 2012); *see also id.* at *6 ("Thus, it appears that Wyoming has made an effort to protect the birds in their natural habitats and not just on land ignored by drillers. The FWS, a participant in the CAS's formation, concluded that if the CAS was fully implemented in Core Areas, it 'would provide adequate protection for sage-grouse and their habitat in that State.'") (citing 75 Fed. Reg. 13975).

MEMORANDUM DECISION AND ORDER - 14

agencies including conservation districts and counties..... The ARMPA is consistent with the Core Area Strategy, but contains additional restrictions to protect other resources, which results in added protections to Greater Sage-Grouse habitat and achieving conservation objectives . . . .").

- o In the ARMPA, the BLM committed to extensive ongoing cooperation efforts with Wyoming. *See* ARMPA, p. 23 , attached as Ex. 12 to Ulrich Decl. (Dkt. 96-14) (identifying ARMPA "management objectives" as including: "In cooperation with the State of Wyoming and its agencies, local governments, private landowners, local sage-grouse working groups, partners and stakeholders, develop site-specific conservation strategies to maintain or enhance sage-grouse habitats and habitat connectivity"; "[m]anage sage-grouse seasonal habitats and maintain habitat connectivity to support population objectives set by the State of Wyoming in cooperation with the agencies"; and "[i]ncorporate available site information collected using the Sage-Grouse Habitat Assessment Framework or similar methods to evaluate existing resource conditions and to develop any necessary resource solutions in cooperation with State of Wyoming, its agencies, the local governments, private landowners, project proponents, partners, and stakeholders"); *see also id.* at p. 26 (identifying "Management Decisions" within "General Management Direction" as including: "**MD GMD 1:** Continue to support the development of statewide sage-grouse seasonal habitat models for the State of Wyoming"; "**MD GMD 2:** Field offices will work with project proponents, partners, and stake holders to avoid or minimize impacts and/or implement direct mitigation . . . . When necessary, offsite compensatory mitigation will be applied consistent with Wyoming's Core Area Strategy"; "**MD GMD 3:** Utilize the Wyoming Sage-Grouse Implementation Team (SGIT) and Local Working Group plans or other state plans, analyses, and other sources of information to guide development of conservation objectives for local management of sage-grouse habitats"; "**MD GMD 5:** The BLM will coordinate new recommendations, mitigation, habitat objectives, and management considerations applied for sage-grouse with the WGFD and other appropriate agencies, local government cooperators, and the Wyoming SGIT"; and "**MD GMD 8:** Each BLM field office will develop landscape-scale restoration, conservation, and maintenance strategies . . ., working with voluntary partners and cooperating agencies. These strategies and habitat designations must be coordinated and reconciled with Wyoming's Greater Sage-Grouse Core Area Protection strategy") (emphasis in original).

- o In February/March 2017, the U.S. Department of Interior (through the BLM and USFWS), the Department of Agriculture (through the Forest Service and Natural Resource Conservation Service), and the State of Wyoming entered into an MOU to "develop intergovernmental communication and mechanisms to provide a cohesive and consistent conservation strategy for the Greater sage-grouse and its habitat in Wyoming." *See* MOU, p. 1, attached as Ex. 10 to Ulrich Decl. (Dkt. 96-12). Under the MOU, the parties

**MEMORANDUM DECISION AND ORDER - 15**

"agree to work collaboratively and put forth a good faith effort to achieve mutually acceptable outcomes consistent with the goals of EO 2015-4 and the respective federal plans." *Id.* at p. 5.

- The NPL Project ROD requires that ARMPA's protection measures be applied. *See* NPL Project ROD, p. 8 (Dkt. 99-2).[9]

The details described above highlight the fact that the ARMPA (which Plaintiffs claim the NPL Project violates) reflects the BLM's recognition of Wyoming's CAS as a viable greater sage-grouse management tool, such that Plaintiffs' challenge to the NPL Project's FEIS and ROD essentially challenges Wyoming's CAS – an extensive plan for managing and conserving sage-grouse populations and habitat in Wyoming, developed over many years and at significant expense through the collaborative efforts of diverse Wyoming-centric stakeholders. Whether Plaintiffs have confidence in or criticism for the Wyoming CAS does not change its inherent ties to Wyoming and it is therefore distinguishable from the Plaintiffs' more expansive challenges to oil and gas lease sales across the western United States (which the Court did not sever and transfer earlier). *See* 9/4/18 MDO, p. 11 (Dkt. 66) ("The subject-matter of this lawsuit [(pre-NPL Project claims)], however, is much more expansive. Plaintiffs contend that, as to such sales

---

[9] Notably, however, this gives way if there is more "current" guidance available. *See* NPL Project ROD, p. 8 (Dkt 99-2) ("The following protection measures from [ARMPA] will be applied, *unless more current guidance is adopted by the BLM . . . .*"); *see also id.* at p. 25 ("The BLM will apply appropriate mitigation standards during site-specific permitting *based on guidance and decisions current at the time.*"); *id.* at p. 26 ("When authorizing third-party actions that result in Sage-Grouse habitat loss and degradation in [Priority Habitat Management Areas] and Winter Concentration Areas [(including Regional Gathering Facilities in these areas)], the BLM will require and ensure appropriate mitigation *that complies with current policy and land use plans.*"). So, while the NPL Project ROD may align with ARMPA and Wyoming's CAS at present, as discussed during oral argument, there is the possibility that in the future an altogether different policy from ARMPA and the CAS becomes the "current" guidance yardstick – particularly when considering Plaintiffs' allegations surrounding the Trump Administration's more recent oil and gas policy/directives. Though of legitimate concern, this possibility is still inchoate and cannot apply to upend what is known and in the record. Even so, if BLM changes position with respect to the NPL Project's current alignment with the ARMPA and Wyoming's CAS, the Wyoming federal court is just as (if not more) capable of addressing that circumstance in light of the other Wyoming-specific factors at play here.

**MEMORANDUM DECISION AND ORDER - 16**

(regardless of which state is involved), there are common violations of federal laws predicated on strategic policy directives from the Trump Administration which, in turn, will result in cumulative impacts threatening sage-grouse across the sage-grouse range. The Plaintiffs' claims are not specific to any particular transferee district; hence, they argue, and the Court is persuaded, that nothing about *the fact of* the lease sales (and any corresponding local interest in the same) raises a compelling argument in favor of transfer. In short, they exist independently from whether Federal Defendants complied with federal law; the leases may be local, but the challenged national policies that created them are not.") (emphasis in original; internal citations omitted). Additionally, recognizing the NPL Project's ties to Wyoming, its impacts (economic, environmental, and otherwise) are logically most distinctly absorbed by Wyoming interests – this is true even *without* Plaintiffs' challenge to the NPL Project and therefore especially so in light of that same challenge.

In sum, Wyoming's connection to the NPL Project, and thus also to Plaintiffs' claims challenging the NPL Project, is more pronounced than Idaho's and operates to overcome Plaintiffs' original choice of forum in this District. *See, e.g., Klamath Tribes*, 2018 WL 3570865 at *7 (acknowledging current and transferee forums' interests in having localized controversies decided at home, stating that "courts consider specific environmental locales or the location of the protective species that 'can give certain districts an especially acute interest' in deciding cases there.") (quoting *Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 2013 WL 120185, *6 (N.D. Cal. 2013)); *Trout Unlimited v. U.S. Dep't of Agric.*, 944 F. Supp. 13, 19-20 (D.D.C. 1996) ("Moreover, suits such as this one, which involve water rights, environmental regulation, and local wildlife – matters that are of great importance in the State of Colorado – should be resolved in the forum where the people 'whose rights and interests are in fact most vitally affected by the suit – the people of [Colorado].") (quoting *Adams v. Bell*, 711 F.2d 161, 167 n.34 (D.C. Cir.

MEMORANDUM DECISION AND ORDER - 17

1983)). Simply put, Wyoming's interests predominate over Idaho's. Plaintiffs' NPL Claims are therefore transferred to the District of Wyoming.

### III. ORDER

Based upon the foregoing, IT IS HEREBY ORDERED that (1) Jonah's Motion to Dismiss or in the Alternative to Transfer (Dkt. 96); (2) Wyoming's Motion to Dismiss or in the Alternative to Transfer (Dkt. 97); (3) Federal Defendants' Motion to Dismiss for Improper Venue or, in the Alternative, to Sever and Transfer (Dkt. 99); and (4) WEA's Motion to Dismiss (Dkt. 100) are GRANTED, in part, and DENIED, in part, as follows:

1. Plaintiffs' NPL Claims are not dismissed. In this respect, the above motions are DENIED.

2. Plaintiffs' NPL Claims are severed from this case pursuant to FRCP 21 and transferred to the District of Wyoming pursuant to 28 U.S.C. § 1404(a). In this respect, the above motions are GRANTED.

The Clerk shall transfer Plaintiffs' NPL Claims – as represented broadly by Plaintiffs' Seventh Claim for Relief (*see supra* at p. 8, n.4) – to the United States District Court for the District of Wyoming.

DATED: July 9, 2019

Ronald E. Bush
Chief U.S. Magistrate Judge

MEMORANDUM DECISION AND ORDER - 18