IN THE UNITED STATES DISTRICT COURT

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2022 APR -5  PM 2 00

MARGARET BOTKINS, CLERK
CASPER

FOR THE DISTRICT OF WYOMING

---

UPPER GREEN RIVER ALLIANCE,
WESTERN WATERSHEDS PROJECT,
and CENTER FOR BIOLOGICAL
DIVERSITY,

        Petitioners,

    vs.

UNITED STATES BUREAU OF LAND
MANAGEMENT and WILLIAM PERRY
PENDLEY, in his official capacity as
Deputy Director of the U.S. Bureau of
Land Management,

        Respondents,

and

JONAH ENERGY, LLC and STATE OF
WYOMING

        Respondent-Intervenors.

Case No.  2:19-CV-146-SWS

---

## ORDER UPHOLDING AGENCY ACTION

---

This matter is before the Court under the Administrative Procedure Act ("APA"), 5

U.S.C. § 706, to review the Bureau of Land Management's approval of the Normally

Pressured Lance Project ("NPL Project"). Respondent Jonah Energy proposed the NPL

Project to extract natural gas resources on the sage-brush scrublands in northwest

Wyoming. Petitioners contend the BLM acted arbitrarily and capriciously in approving the

1

project because the agency did not take a "hard look" at impacts to wildlife, particularly greater sage grouse and pronghorns. All parties have fully briefed the matter.[1] (ECF Nos. 52, 57, 58, 59, 62.)

On review, this Court determines the BLM complied with NEPA and the agency took a "hard look" at all potential environmental impacts. The agency properly considered several alternatives and responded to public comments throughout the administrative process. Accordingly, the Court affirms the BLM's decision approving the NPL Project.

## FACTUAL BACKGROUND

### a. Greater Sage Grouse Habitat

The greater sage grouse is a bird native to the western United States, including northwest Wyoming. (BLM126800.) The bird's survival is largely dependent on sagebrush, which is found throughout Sublette County, Wyoming, including the NPL Project Area.[2] (BLM126798.) Loss of sagebrush across the country has contributed to sage grouse population decline over the past century. (BLM126802.) However, the Upper Green River Valley in Wyoming attracts thousands of sage grouse every winter. (BLM127089.)

Sage grouse Winter Concentration Areas[3] ("WCAs") are places where groups of sage grouse congregate and live during the winter, primarily between early December and mid-March. (BLM128627.) Sage grouse prefer locations in the winter where sage brush

---

[1] The Court concludes oral argument would not materially assist in the consideration of this review. *See* Local Civil Rule 83.6(c). The Court carefully considered the parties' briefing and reviewed the thousands of documents comprising the administrative record. Consequently, the Court has all the information necessary to render its decision.

[2] The Project Area is an eleven-mile area considered the "analysis area" for the sage grouse population which may be affected by the NPL Project. (*See* BLM128401; BLM128627.)

[3] Governor Mead defined this term to recognize the unique nature of these wintering grounds to sage grouse. (Wyoming Executive Order 2015-4 at 5.)

2

grows higher than the snow and even though the WCAs are outside of primary sage grouse habitat, these areas are "important to maintaining sustainable Sage-Grouse populations." (BLM128628.) Any type of surface disturbance in WCAs is prohibited during the winter to protect the habitat for the sage grouse. (Wyoming Executive Order 2015-4 at 6–7.)

Sage grouse are sensitive to human activities, including oil and gas development. Sage grouse avoid wintering anywhere within 1.18 miles (1900 meters) of such activities. (BLM077925.) The greater the well pad density in an area, the less likely sage grouse will use that habitat during winter. (*See generally* BLM017143.) This avoidance could further decrease the Wyoming sage grouse population. (BLM 072677; *see also* BLM017105.)

Decline in the sage grouse population over the past century has sparked national conversations about protecting the species. In 2010, the U.S. Fish and Wildlife Service listed the greater sage grouse as "warranted, but precluded" in favor of higher priority species. 75 F. Reg. 13,910 (March 23, 2010). The primary threats to sage grouse were habitat loss and fragmentation, which were exacerbated by the lack of regulation to protect sage grouse. *Id.* In response to the "warranted, but precluded" designation, the BLM released a finalized list of amendments (2015 Wyoming Sage-Grouse Resource Management Plan Amendments) to protect sage grouse habitat. (BLM139375; BLM139384.)

The 2015 Wyoming Sage-Grouse Resource Management Plan Amendments ("RMP") designated "priority" and "general" habitat management plans for sage grouse, including additional protective measures. (BLM139457; BLM139469.) A priority habitat management area ("PHMA") is one with the "highest conservation value to maintaining or

3

increasing sage grouse populations." (BLM139469.) These PHMAs do not include WCAs. The only protection required by the RMP in WCAs is a prohibition on surface disruption during the winter, when sage grouse use the habitat. (BLM139410.) Any additional protection measures for WCAs are determined as needed in consultation with the Wyoming Game and Fish Department ("WGFD"). (BLM139410.)

The RMP also requires phased development for any oil and gas exploration within sage grouse habitat. (BLM139502–04; BLM053287.) This is a protective measure known as a required design feature ("RDF") enumerated in the RMP. (BLM053287–88.) However, an RDF is not required if either: (1) it is not applicable to the site-specific conditions of the project or (2) an alternative protective measure is determined to provide equal or better protection to sage grouse or its habitat. (BLM053287.)

### b. Pronghorn Migration

The pronghorn is an ungulate native to North America, found throughout the western United States. (BLM078857.) This case specifically analyzes the impacts to the Sublette Pronghorn Herd Unit (Herd Unit 401) which includes most pronghorn in Western Wyoming. (BLM128610.) Herd Unit 401 is found in and around the Project Area.[4] (*Id.*) Pronghorn located in Grand Teton National Park make a yearly migration through the Upper Green River Valley and Bridger-Teton National Forest. (BLM078859; BLM061274; BLM081323; BLM082388; BLM128610–11.) This migration, known as "Path of the Pronghorn," follows a 6,000-year-old migration corridor extending between

---

[4] Herd Unit 401 is a WGFD-designated population. (BLM128610.) The NPL Project Area falls entirely within Herd Unit 401 management area. (*Id.*)

100 and 150 miles through north-west Wyoming. (BLM078857; BLM078859; BLM133184; BLM133184.) During this migration, pronghorn traverse the route over the course of three days. (BLM078859.) In the spring, the pronghorn travel the same route at a slower pace to return to Grand Teton National Park. (*Id.*) The Path of the Pronghorn is designated as a protected national migration corridor[5] by the U.S. Forest Service, although the protection does not extend to the Upper Green River Valley, where the NPL Project would be located.[6] (BLM081401; BLM078890.)

The Path of the Pronghorn is the only remaining route for pronghorn in Grand Teton National Park to reach the Upper Green River Valley. (BLM078859.) There are no alternate migratory routes available for these pronghorns. (*Id.*) "Development in crucial winter range and migration routes could . . . eliminate the herd's migration memory and break the tradition of migration to the most suitable winter habitats, thus reducing the viability of pronghorn Herd Unit 401 in perpetuity." (BLM128980.) The Path of the Pronghorn runs through part of the NPL Project Area. (BLM130957.)

Although studies on this topic are limited, research indicates pronghorn are sensitive to oil and gas development and this development can hinder pronghorn movement and

---

[5] WGFD does not use the term "migration routes" and the BLM properly included suggestions from state agencies like WGFD when adopting these same designations. (BLM128611; BLM076835–36); 40 C.F.R. § 1501.8. "Migration corridors are areas of the landscape that a substantial portion of the herd or herd segment uses consistently to move between seasonal habitats." (BLM128611 at n. 35.) Migration routes are a term used by the BLM to "identify migration pathways consistently used by wildlife to make seasonal movements between winter and summer ranges." (*Id.*) Migration corridors are an official WGFD designation, while migration routes are not. (*Id.*) The WGFD submitted a comment after the draft EIS was released, clearing up this confusion and specifying the difference between routes and corridors. (BLM076836.)

[6] The federal protection does extend to one specific area in the Upper Green River Valley: 9,500 acres at Trapper's Point are designated as an Area of Critical Environmental Concern. (BLM134805.) To protect this area, two highway overpasses and six underpasses are located in this area to eliminate threats to Pronghorn passing through the Highway 191 corridor. (BLM007286.)

migration. (*See* BLM133428; *see* also BLM133462; BLM133503*.*) Pronghorn tend to avoid areas of oil and gas development by approximately 0.25 to 0.6 miles and avoid well pads within 100 meters. (BLM072696.) When pronghorn encounter development along migration routes, they may avoid these areas entirely, which can negatively impact foraging opportunities. (BLM127302; *see* BLM061274–75.) Oil and gas development along pronghorn migratory routes has the potential to significantly diminish the health of a herd. (BLM126616; *see* BLM 061274–75.)

### c. Normally Pressured Lance Project

Respondent-Intervenor Jonah Energy ("Jonah") submitted a proposal to extract natural gas resources from certain areas of its federal leases in Wyoming. (BLM128268–69.) The NPL Project Area, spans approximately 140,859 acres in Sublette County, Wyoming. (BLM128193) Currently, there are about 116 total wells already drilled within the Project Area, including fifty-five natural gas wells. (BLM128268.) The NPL Project would be located near two existing development projects: the Jonah Infill Development Project and the Pinedale Anticline Project. (BLM 127835.) The proposal requests permission to begin the project using delineation wells to determine the extent of the natural gas resources in the NPL project area, because no similar exploration has been done.[7] (BLM128301) Ultimately, Jonah plans to drill up to 3,500 directionally drilled natural gas wells using multi-well pads in the NPL Project Area. (BLM128193.) The proposal includes plans to develop up to 350 new wells per year, including the necessary

---

[7] Jonah plans to use the information from the delineation wells as a basis for potential future development. (BLM128301.)

facilities, such as well pads, access roads, and pipelines. (*Id.*) The NPL Project development phase would span ten years, but the overall production phase would be thirty years. (BLM043705.) Jonah estimates the total lifespan of the NPL Project to be forty years. (BLM127835.)

The NPL Project Area is primarily sagebrush scrubland. (ECF No. 15 at 2; BLM128627; BLM128564.) The State of Wyoming effectively owns the pronghorn and sage grouse species (as it does all wildlife) within the NPL Project Area. Wyo. Stat. Ann. § 23-1-103 (2021). The State's goal is providing "an adequate and flexible system" to manage wildlife. *Id.* Wyoming prioritizes wildlife protection by maintaining habitat functionality through avoidance and minimization. (BLM000712). WGFD places special emphasis on big game crucial winter ranges and sage grouse nesting and brood-rearing habitats. (*Id.*)

The NPL Project Area includes three non-WGFD pronghorn migratory routes and "areas of active migration," including the Path of the Pronghorn, used by the Grand Teton Herd. (BLM129017–18; BLM128610–11; BLM130957; BLM130969.) Importantly, there are no WGFD-designated pronghorn migration corridors in the NPL Project Area. (BLM128611.) Two herds of pronghorn were recorded using the NPL Project Area in 2010. (BLM128610.) The BLM acknowledged the project area contains approximately 20,800 acres of pronghorn crucial winter range.[8] (BLM129017.) However, the Project Area includes areas that are important to pronghorn year-round. (BLM128972.)

---

[8] Pronghorn crucial winter range are areas designated by the WGFD as areas that are a determining factor to the pronghorn population's long-term survival. Julie Young, et al., *Wildlife and Energy Development Pronghorn of the Upper Green River Basin – Year 3 Summary*, WILDLIFE CONSERVATION SOCIETY (July 2008).

Sage grouse also have substantial habitat in the Project Area, including nesting ground, leks,[9] and WCAs. (BLM 128481; BLM128501.) The Project Area includes Wyoming's largest concentration of wintering sage grouse. (*Id.*)

### d. Public Input on the NPL Project

On February 27, 2008, the BLM began scoping[10] for the NPL Project proposal. (*See* BLM000472). On March 28, 2008, the BLM received a comment from the WGFD, asking the BLM to analyze WGFD recommendations. (BLM000701.) The WGFD included a copy of "Recommendations for Development of Oil and Gas Resources within Crucial and Important Wildlife Habitats" in their comment. (BLM000701; BLM000705.) These recommendations were compiled by senior wildlife biologists, utilizing available scientific data, and are intended to "avoid, minimize, and mitigate actual and anticipated impacts to habitat functions resulting from large-scale oil and gas development." (BLM000706–07.)

In April 2011, the BLM opened up a public comment period to gain a better understanding of the issues the environmental impact statement ("EIS") should address. (BLM043669.) This scoping period included three scoping meetings in Wyoming for the

---

[9] Male sage grouse are best known for mating display dances performed every spring in various "leks." A lek is a "bare area where male Sage-Grouse perform courtship displays to attract females." (BLM128628.) A lek is considered active if it is used by a male sage grouse during mating season. (*Id.*) There are fifty-six leks within eleven miles of the Project Area, forty-four of which are considered occupied. An occupied lek is one where a male has been active during at least one mating season in the past ten years. (BLM128628.) Within the NPL Project Area, there are ten occupied leks. (*Id.*)

[10] Scoping is the process by which the BLM identifies "planning issues that should be considered in the land management plan" and then "analyzes these issues and uses them to develop a range of alternative management strategies." *Public Involvement*, BUREAU OF LAND MANAGEMENT, https://www.blm.gov/programs/planning-and-nepa/public-participation (last visited Jan. 19, 2022).

public to come and voice concerns. (*Id.*) In response, the BLM received several comments expressing concern[11] about the project, including:

a. A comment from the National Park Service, noting the oil and gas development may prevent pronghorn from following the migration route and returning to Grand Teton National Park. (BLM004546.) This comment requested the EIS analyze how the NPL Project would affect the Grand Teton Pronghorn herd. (BLM004547.)

b. Comments requesting phased development and drilling (BLM004887; BLM079468.)

c. A general comment expressing concern for the NPL Project's impacts on pronghorn migration. (BLM003888–89.)

d. Comments requesting directional drilling to protect migratory routes, including Path of the Pronghorn (BLM007149; BLM007289; BLM079468.)

e. Comments expressing concern about the impact to sage grouse habitats and requesting buffers between well sites and leks. (BLM004887; BLM007149; BLM079468; BLM003888.)

As a part of the review, BLM conducted surveys to determine sage grouse wintering grounds within the NPL Project Area, but those surveys did not provide a complete picture of sage grouse wintering habits because they were only conducted during a short time frame. (BLM 008132; BLM 017185.) This short time frame was a "flight day."

---

[11] From the 1,238 comments and concerns received during the scoping period, the BLM identified 29 issue statements, which it used to develop the scope of the EIS. (BLM043669.) The relevant issue statements to this case include: (1) "Will the NPL Project affect special status species and their habitat?"; (2) "To what extent should the BLM limit surface disturbance within the project area"; and (3) "How will the NPL Project affect wildlife and habitat?" (BLM043670; BLM043778.)

(BLM008132.) "Flights represent a 'one shot in time' assessment of where wintering birds are located on the flight day and do not encompass where [sage grouse] are located throughout the winter." (*Id.*)

In March 2015, the BLM and the WGFD recommended the state protect certain "core areas" of designated sage grouse habitat by limiting surface disturbance to 5%.[12] (Wyoming Executive Order 2015-4 at 5.) The State found the necessary protections could be adequately determined through the NPL Project environmental review. (*See id* at 6–7, 14.)

### e. Draft Environmental Impact Statement

In July 2017, the BLM released the Draft EIS for further public review and comment. (BLM043666). The Draft EIS introduced four possible alternatives for the project: (1) a "no action" alternative; (2) "proposed action" alternative, i.e., the NPL Project submitted by Jonah; (3) Alternative A, which addressed sensitive wildlife resources, and (4) Alternative B, which addressed concerns to conserve a broad range of resource values and constrain development to the least environmentally sensitive areas. (BLM043672–73.) Alternative B was the BLM's preferred alternative. (*Id.*)

The BLM also considered nine additional alternatives that were ultimately eliminated before the BLM conducted a detailed analysis. (BLM 043676.) One of these alternatives focused on additional protection measures for sage grouse WCAs. (*Id.*) The

---

[12] Despite requests to recognize the importance of "core areas" of sage grouse habitat, the State of Wyoming declined to issue a blanket protection over these areas. (*See* BLM127089; *see also* BLM015584.)

BLM eliminated this alternative because it "would not be technically or economically feasible." (*Id.*)

The BLM determined the proposed action would potentially directly impact wildlife because of short-term and long-term surface disturbance. (BLM043697.) Alternative A slightly decreased these impacts by reducing surface disturbance by 4.2% and reducing access roads by approximately twelve miles. (*Id.*) Alternative B resulted in even greater reduction of surface disturbance (7.9%) and reduced "density of development" in the first development area. (*Id.*) Alternative B also included twenty-two fewer miles of access roads. (*Id.*)

The BLM found these same impacts on Big Game, including pronghorn. (BLM043698.) The proposed action would result in several indirect impacts on the pronghorn population, "including habitat loss, fragmentation, increased avoidance by and displacement of individuals and groups, decreased habitat quality, and migration disruptions[.]" (*Id.*) In addition to the impacts discussed for wildlife generally, Alternative A would limit the "density of development and reduced surface disturbance in pronghorn crucial winter range in [specified development areas within NPL Project Area.]" (*Id.*) Alternative B also included the same reductions in surface disturbance and access roads noted above, but also decreased development in a "more clustered pattern[.]" (*Id.*)

The Draft EIS also acknowledged the Grand Teton Pronghorn Herd (Herd 401) and its reliance on the NPL Project Area. (BLM044132.) The EIS noted Herd 401's unique migration route and recognized that three pronghorn migration routes cross the analysis

area. (BLM044133.)[13] "Habitats associated with the [NPL Project Area] are important to pronghorn year-round, including during migration, when large herds of species are moving long distances between seasonal ranges." (*Id.*) The Draft EIS identified Highway 191 as a current barrier to pronghorn migration—pronghorn may use the NPL Project Area to migrate to seasonal ranges to avoid crossing Highway 191. (*Id.*)

Turning to greater sage grouse specifically, the Draft EIS noted the species could be impacted by the proposed action, including by habitat loss and degradation, although this impact would be least severe within the Sage-Grouse PHMA. (BLM043700–01.) The proposed action could increase sage grouse mortality because of "decreased quantity and quality of suitable habitat, increased avoidance and displacement, [and] increased habitat fragmentation[.]" (BLM043701.) Even following the BLM Wyoming Sage-Grouse RMP Amendments, development and surface disturbance could still adversely affect the sage grouse population within the Sage-Grouse PHMA. (*Id.*)

Under Alternative A, short term surface disturbance affecting sage grouse would increase because of the buried pipelines and overall, the effects on sage grouse under Alternative A would be similar to the Proposed Action. (BLM043702.) Under Alternative B, surface disturbance would be reduced, and a clustered pattern of development areas would result in fewer disturbance locations overall. (*Id.*) Short term adverse impacts to the sage grouse population may increase under Alternative B, but ultimately result in reduced long term adverse effects. (BLM 043703.)

---

[13] The Final EIS confirmed this statement. (BLM130957; BLM130969.)

The Draft EIS stated the NPL Project "could result in decreased quantity and quality of suitable breeding, wintering, and foraging habitat for Sage-Grouse, resulting from surface disturbance, vegetation clearing, and other project related activity[.]" (BLM043705.) The EIS noted the adverse impacts "could persist for up to 40 years[.]" (*Id.*) The degradation of sage grouse habitats, including sage grouse winter habitats within the NPL Project Area, could impact sage grouse life cycles and populations in Wyoming. (BLM043706.)

After the BLM released the Draft EIS, it opened up the public comment period again for another forty-five days. (BLM043667) The public response focused on the Draft's lack of analysis on any effects to the Grant Teton pronghorn herd's migration routes. (BLM 077006; 077012–13; BLM076754; BLM080028; BLM076986). Comments also recognized the Project's potential to disturb wintering sage grouse. (BLM077009–12; 076758–59.) Other comments requested the BLM to consider a phased drilling alternative. (BLM076987; BLM 079467–68.)

The BLM received a comment from the WGFD asking for a more careful delineation between pronghorn migration corridors and routes. (BLM076836.)

> While we appreciate the effort to protect migrating pronghorn, placing excessive protections on individual pronghorn migration routes [such as those non-WGFD migration routes in the Project Area[14]] may hamper our efforts to designate corridors elsewhere in the state that may be more important to pronghorn populations overall. The Department would prefer that the project be designed so that pronghorn movement patterns are not constricted in the project area, rather than trying to compensate for impacts to routes of individual animals.

---

[14] WGFD uses the term "migration route" to identify specific paths used consistently by individual animals making seasonal movements, while migration corridors are used by a "substantial portion of the herd[.]" (BLM076835–86.)

(*Id.*)

## f. Final Environmental Impact Statement

After considering the second round of comments, in June 2018, the BLM published the Final EIS. (BLM128191.) Similar to the Draft EIS, the Final EIS included four potential alternatives: (1) No Action; (2) Proposed Action; (3) Alternative A; and (4) Alternative B. (BLM128197–98.) However, in contrast to the Draft EIS, the Final EIS included two potential scenarios under Alternative B. (BLM129198.) Alternative A was still listed as an alternative developed to address sensitive wildlife resources. (BLM129197.) This alternative ended with the same number of wells but changed the location, timing, and pattern of development and drilling. (*Id.*) The Project Area would be divided into several development areas ("DA"), and the development in each DA would be driven by the "presence or absence of delineated wildlife habitats[.]" These adjustments would lengthen the development time period for the NPL Project, because less wells would be drilled each year. (*Id.*) Development would be completed sequentially in three phases overall, with development in the sage grouse PHMA divided into further phases. (*Id.* at BLM128197–98.)

Alternative B was still listed as the BLM preferred alternative and attempted to conserve a broad range of resources and restrict development to the least environmentally sensitive locations within the Project Area. (BLM128198.) Alternative B focused on conservation overall, rather than on the wildlife specifically. (*Id.*) The project under Alternative B would include the same number of wells, but certain DAs would have reduced density of development to "reduce impacts to a range of sensitive resources in this

14

area." (*Id.*) In addition, the BLM considered two potential development scenarios within this alternative: Scenario 1, which would utilize a seasonal timing limitation on development during the sage grouse wintering period, and Scenario 2, which would utilize the same seasonal timing limitation but also add a disturbance threshold "and other measures" to reduce environmental impacts. (*Id.*)

The Final EIS noted pronghorn were present in the NPL Project Area year-round but some "20,688 acres of crucial winter/year-long habitat, essential for the long-term viability of the population, are located throughout the north-central portion of the Project Area, with additional smaller areas along the southwestern Project Area boundary[.]" (BLM128610.) Pronghorn in the Project Area make a uniquely long migration through the Upper Green River Basin, traveling between seventy-two and one-hundred sixty miles. (BLM128611.) And while there are three total pronghorn migration routes that pass through the Project Area, none of these are WGFD-designated pronghorn migration corridors. (*Id.*) The Grand Teton Herd does utilize winter ranges within the Project Area. (*Id.*) The Final EIS did acknowledge "[d]egradation of seasonal habitat and disruptions in migratory routes . . . are of particular concern for pronghorn due to the presence of crucial winter range . . . and the presence of migration routes that connect pronghorn crucial winter range and other pronghorn habitats in the analysis area and the region." (BLM128980.)

The EIS also noted that, while drilling would be prohibited in the crucial winter ranges from November 15 through April 30, surface disturbance could still affect migration routes. (*Id.*) Because of these possible adverse effects "Jonah Energy has committed to work with the BLM, the WGFD, and other stakeholders to better understand and, if

possible, preserve migration routes in the Project Area, and would avoid activities and facilities that create barriers to the seasonal movements of all big game, including pronghorn[.]" (*Id.*) However, the NPL Project could reduce "the viability of the pronghorn Herd Unit 401 in perpetuity." (*Id.*)

The Final EIS included a phased development pattern in Alternative A, which would reduce potential impacts to pronghorn. (BLM129003.) Overall, Alternative A would reduce impacts to pronghorn migration and crucial winter range, as compared to moving forward with the NPL Project as proposed. (*Id.*) Under Alternative B, the impacts to pronghorn migration would be the same as moving forward with the NPL project as proposed. (BLM129018.) The proposed action (and alternatives) would be unlikely to result in direct adverse impacts to migration corridors and migration bottlenecks[15] because there are no bottlenecks within 6.2 miles of the Project Area. (BLM128878.)

Turning to the sage grouse, the EIS noted the grouse can be found in the NPL Project Area at all times of the year and that 34% of the Project Area includes PHMA. (BLM128627.) Overall sage grouse populations in Wyoming have declined since 1960, but peak male lek attendance has risen each year since 2013. (BLM128624.) Sage grouse populations are in decline across the country largely due to human activities including "disturbance due to oil and gas development." (BLM128626.) "Research has shown that functional habitat loss occurs due to human activities, including noise, which cause Sage-Grouse to avoid areas even when sagebrush remains intact[.]" (*Id.*) The Final EIS used a

---

[15] A bottleneck is "any portion of a . . . migration corridor where animals are significantly physically or behaviorally restricted." Wyoming Executive Order 2020-1 (Feb. 13, 2020) (defining bottlenecks in the context of mule deer and antelope).

density disturbance calculation tool to calculate approximately .55% of PMA in the NPL Project Area already has existing surface disturbance. (BLM128629.)

A two-mile radius buffer from any noise or drilling activities around known leks is necessary to ensure sage grouse attendance. (BLM128500.) When there is noise from drilling or road activity within two to three miles of a lek site, male sage grouse avoid the leks. (*Id.*) Because there were ten known leks within the NPL Project Area, noise must stay below 10dBA about the existing baseline noise level to conform with the Wyoming Sage-Grouse RMP Amendments. (BLM128501.)

Next the Final EIS recognizes, while there is potential for impacts on wintering sage grouse, those impacts "are not well understood" due to "limited research[.]" (BLM128302.) To attempt to mitigate this limited knowledge, the BLM would conduct a study "concurrently with development activities to better understand the impacts of developing in Winter Concentration Areas." (*Id.*) This study "would inform analysis during site-specific NEPA reviews." (*Id.*) Additionally, for all alternatives considered, "the BLM would defer authorizing development in Winter Concentration Areas until additional research is conducted to better inform the appropriate level of development, potential impacts, and appropriate mitigation[.]" (BLM128994.)

Moving on to discuss the impact of the NPL project on sensitive species, the Final EIS points out male lek attendance declines "up to four miles from oil and gas well surface locations" and in some cases may be even greater than four miles. (BLM128975.) The document also notes the highest concern for pronghorn is degradation of seasonal habitat and the potential for disruption to the migratory route. (BLM128980.) The NPL Project

17

would likely cause "displacement and disrupt [pronghorn] migration patterns" within the Project Area. (*Id.*) "Although the BLM prohibits the development of new wells in pronghorn crucial winter range from November 15 to April 30, drilling and other surface-disturbing activities could occur in areas outside of designated range, including migration routes." (*Id.*) However, the Wyoming RMP Amendments would prohibit any drilling from December 1 through March 15, which would "minimize potential impacts to overlapping pronghorn migration routes from the [NPL Project] during the wintering period." (*Id.*)

After the Final EIS was released, the BLM opened it to public comment for thirty days. (BLM127870.) The BLM received nine comment letters during the thirty-day period and one additional comment letter shortly after the comment period closed. (*Id.*) These comments included input on development in Winter Concentration Areas and concerns about how the NPL Project would affect pronghorn and sage grouse. (*Id.*)

### g.  Record of Decision

The BLM ultimately adopted Alternative B in the Record of Decision ("ROD"), released in August 2018. The process from proposal to decision took ten years. Overall, this alternative was the best choice to avoid and reduce impacts to the environment and sensitive wildlife while still allowing for recovery of natural gas resources. (BLM127865.) The decision required the project area be divided into three development areas ("DAs"), requiring different development density in each DA. (BLM127836.) DA 1, which includes WCAs and pronghorn habitat, is limited to an average of one disturbance location per 640 acres. (BLM127837.) DA 3, which includes sage grouse PHMA, has the same density

18

disturbance limit as DA 1. DA 3 also restricts total disturbances to 5% surface disturbance per 640 acres, including existing disturbances. (BLM127838.)

Specifically, the BLM authorized Scenario 1 of Alternative B, outlined in the Final EIS. (BLM127844.) Scenario 1 allows for a concurrent study with limited development in WCAs, in order to improve limited research in the area. (BLM127843.) Scenario 1 also applies seasonal timing limitations on development in the winter, to conform to the RMP amendments. (BLM127844.) However, the decision may be adapted for Scenario 2, based on the results of the study. (*Id.*)

Jonah Energy is allowed to move forward on NPL Project only by complying with a long list of resource protection measures, listed in Appendix A of the Record of Decision. (BLM127854.) Besides the measures already discussed specific to Alternative B, Scenario 1, the additional resource protection measures include: (1) limiting drilling activities and surface use during winter migratory periods and big game birthing areas and (2) requiring Jonah to avoid activities and facilities that prevent seasonal big game migration. (BLM127897.)

The decision also incorporated several restrictions to protect sage grouse leks, sage grouse habitat, and WCAs. (BLM127841.) As a baseline requirement, "development will be consistent with the BLM Wyoming Sage-Grouse RMP Amendments[.]" (BLM127897.) This includes noise level constraints, limits on road construction, buffer perimeters to development around leks, and limits on development during winter months. (BLM127841–42.) The final decision incorporated "goals, objectives, management decisions, and

required design features from the BLM Wyoming Sage-Grouse RMP Amendments." (BLM127866.)

## PROCEDURAL BACKGROUND

Petitioners originally filed a complaint in the United States District Court for the District of Idaho on April 30, 2018. (ECF No. 1.) The complaint included several contentions with BLM action and the effect on sage grouse habitat, including those before this Court. (*See* ECF No. 2.) The District of Idaho severed all claims related to the NPL project, pursuant to F.R.C.P. 21. (*Id.* at 6.) The court transferred all NPL claims to the District of Wyoming because the project was more closely connected to Wyoming and "Wyoming's interests predominate over Idaho's." (*Id.* at 17–18.)

On July 15, 2019, all NPL claims were transferred to this Court. (ECF No. 1.) On February 19, 2020, Petitioners filed an *Amended Petition for Review*. (ECF No. 15.) After several months of supplementing the administrative record, Petitioners filed their *Opening Merits Brief* (ECF No. 52) on April 8, 2021. Respondent filed its brief in opposition on June 23, 2021 (ECF No. 57) and Respondent-Intervenors each filed respective response briefs as well (ECF No. 58; ECF No. 59). Petitioners filed a reply brief on August 20, 2021. (ECF No. 62.) The matter is now ripe for consideration.

## PETITIONER'S ARGUMENTS

Petitioners make two main arguments against the BLM's ROD. First, they argue the BLM violated the National Environmental Protection Act by failing to take a "hard look" at the consequences of the project. (ECF No. 52 at 33.) This includes the BLM's alleged failure to consider reasonable alternatives to the project. (*Id.*) Within this argument,

20

petitioners assert three sub-arguments: (1) BLM failed to consider the NPL Project's impact on the Path of the Pronghorn and the pronghorn herd in Grand Teton National Park; (2) BLM failed to consider reasonable proposed alternatives to protect the Path of the Pronghorn and other similar migratory routes through the NPL Project Area; and (3) BLM failed to take a "hard look" at the NPL Project's potential negative impacts to the Wyoming sage grouse population. (*Id.* at 34, 30, 49.) Second, the BLM violated FLPMA by disregarding the 2015 Sage Grouse RMPs.

Petitioners assert the final EIS did not analyze how the NPL Project could potentially eliminate the pronghorn from Grand Teton National Park. (*Id.* at 32.) While the EIS did acknowledge the NPL Project could impact pronghorn winter ranges and "migratory routes generally," it failed to analyze the significance of the Path of the Pronghorn as one of the "few remaining long-distance migrations in the world[.]" (*Id.* at 35–36.) The impacts on this migratory route could have "'indirect recreational and ecological effects on Grand Teton National Park, which the EIS also fails to acknowledge." (*Id.* at 38.) The EIS should have specifically analyzed the Path of the Pronghorn and the impacts on Grand Teton National Park separately, rather than focusing on the Sublette pronghorn herd generally. (*Id.* at 39–40.)

Petitioners also take issue with BLM's failure to consider proposed alternatives to protect the Path of the Pronghorn and other migratory routes. (*Id.* at 40.) Comments suggested buffer zones to development along migratory routes. (*Id.* at 40 (citing BLM080028; BLM079469)). None of the alternatives identified in the EIS absolutely prevented development along migratory routes, "much less a buffer zone around them."

21

(*Id.* at 42.) The two alternatives either prevented any action altogether or only gave the "mere possibility of voluntary protection of migratory routes" which was unreasonably narrow. (*Id.* at 43.) This narrow analysis and failure to address why other alternatives were not included in the EIS was a violation of NEPA's "hard look" standard. (*Id.* at 44.) Ultimately, the EIS limited the range of alternatives and failed to give adequate explanation for this unreasonable limit. (*Id.* at 48.)

The third sub-argument focuses on the BLM's failure to consider all reasonably foreseeable impacts to the sage grouse WCAs. (*Id.* at 49.) Petitioners argue the BLM lacked sufficient baseline data to even analyze the impacts to these areas, and failure to collect this data violated the BLM's obligations under NEPA. (*Id.*) Even after acknowledging the lack of data in this area, the best the EIS did was promise a concurrent study on the effects of sage grouse in conjunction with approval of the NPL Project. (*Id.* at 50–51.) The BLM could not adequately assess the effects on sage grouse WCAs in the EIS because it did not have the data to do so. (*Id.*) The limits to disturbance location density adopted by the ROD could still allow for significant impacts to WCAs. (*Id.* at 52.) The BLM ignored the incomplete information on sage grouse, even though it was relevant to reasonably foreseeable effects of the NPL Project. (*Id.* at 55.)

Second, Petitioners argue BLM violated the Federal Land Policy and Management Act ("FLPMA") by failing to comply with the 2015 RMP Amendments. (*Id.* at 58.) FLPMA requires the BLM to implement all activities in accordance with governing RMPs, including the 2015 Sage Grouse RMP. (*Id.* at 58.) The 2015 RMP requires the NPL Project to implement a phased development approach but the BLM rejected this alternative. (*Id.* at

22

59–60.) The NPL Project ROD gives a blanket statement that it is in conformity with the 2015 RMP but never discusses the phased development requirement. (*Id.* at 60.) This was a clear violation of FLPMA's requirements and failure to conform renders the NPL ROD void. (*Id.* at 62.) Respondents assert various counter-arguments in three separate briefs. (ECF No. 57; ECF No. 58; ECF No. 59.) These counter-arguments will be addressed as relevant.

LEGAL STANDARD

### 1. The Administrative Procedure Act

The Administrative Procedure Act (APA) governs this review. *See* 5 U.S.C. § 702; *see also Lujan v. Nat'l Wildlife Federation*, 497 U.S. 871, 882–83 (1990) (reiterating that NEPA does not provide a private right of action). The review in this case is sought under the general review provisions of the APA, and so the agency action at issue must be a final action. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990). Section 706 of the APA guides this Court's analysis of the issue. 5 U.S.C. § 706. The reviewing court must set aside the agency action if it was arbitrary, capricious, an abuse of discretion, or disregarded the law. *Id.*

An agency action is arbitrary and capricious if: (1) the agency relied on factors not enumerated by Congress; (2) did not consider an important aspect of the problem; (3) offered justifications for the action that were contrary to the evidence; or (4) is so implausible that it cannot be attributed to differing opinions or levels of expertise. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The court uses the administrative record for a factually exhaustive but legally narrow

23

review. *Biodiversity Conservation Alliance v. Bureau of Land Management*, No. 09-CV-08, 2010 WL 3209444, at *5 (D. Wyo. June 10, 2010).

The reviewing court determines whether the agency considered all relevant factors and made a clear error of judgment. *Biodiversity Conservation Alliance*, No. 09-CV-08, 2010 WL at *4. The agency's determination must be supported by facts on the record—there must be a rational connection between the facts and the agency's decision. *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1574 (1994). Using a substantial evidence standard of review, the court determines whether there is enough evidence that a reasonable mind might find support the agency's decision. *Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003). Evidence may be considered substantially in support of the agency's decision, even if there is also evidence to support a contrary decision. *Wyoming Farm Bureau Federation v. Babbitt*, 199 F.3d 1224, 1241 (10th Cir. 2000) ("the mere presence of contradictory evidence does not invalidate the Agencies' actions or decisions"). However, the court is not permitted to use post hoc justifications for the agency's decision or substitute its judgment for that of the agency. *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 740 (10th Cir. 1993); *see Schneider v. Nat'l, Inc. v. Interstate Commerce Comm'n*, 948 F.2d 338, 343 (7th Cir. 1991).

## 2. National Environmental Protection Agency

The National Environmental Protection Agency ("NEPA") exists "to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans." 42 U.S.C. § 4331(a). NEPA's purpose is twofold. "First, it places upon an

24

agency the obligation to consider every significant aspect of the environmental impact of a proposed action. Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decision making process." *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983).

To ensure compliance with NEPA, all agencies of the federal government are required to provide a detailed environmental impact statement on any major federal action which significantly affects the quality of the human environment. 42 U.S.C. § 4332(C). "The environmental impact statement shall succinctly describe the environment of the area(s) to be affected or created by the alternatives under consideration, including the reasonably foreseeable environmental trends and planned actions in the area(s). 40 C.F.R. § 1502.15. The agency should focus on important issues rather than "useless bulk in statements." *Id.* An environmental impact statement should be followed by a record of decision, stating the decision and all considered alternatives. 40 C.F.R. § 1505.2. The record of decision must also state "whether the agency has adopted all practicable means to avoid or minimize environmental harm from the alternative selected, and if not, why the agency did not." *Id.*

Under NEPA, the record of decision will be arbitrary and capricious if the agency did not take a "hard look" at all relevant information when making the decision. *New Mexico ex rel. Richardson v. Bureau of Land Management*, 565 F.3d 683, 704 (10th Cir. 2009). Importantly, NEPA does not require certain outcomes or any specific substantive action by the agency. *Id.* The agency only requires procedural steps and "merely prohibits uninformed—rather than unwise—agency action." *Id.* (quoting *Robertson v. Methow*

*Valley Citizens Council*, 490 U.S. 332, 351 (1989). The agency's decision is presumptively valid and the party challenging the decision has the burden of proof. *Citizens' Committee to Save Our Canyons v. Krueger*, 513 F.3d 1169, 1176 (10th Cir. 2008). The reviewing court must differentiate between actual deficiencies in the agency's analysis which affected the informed decision-making process and "mere flyspecks[.]" *Utahns for Better Transp. V. U.S. Dept. of Transp.*, 305 F.3d 1152 (10th Cir. 2002). "Agencies are not required to elevate environmental concerns over other valid concerns." *Cure Land, LLC v. United States Dep't of Agriculture*, 833 F.3d 1223, 1235 (10th Cir. 2016) (internal citations and quotations omitted).

## STANDING

Petitioners assert they have standing (ECF No. 52 at 32), and Respondents do not contest this issue. To show they have standing, petitioners must have suffered a concrete and particularized injury that is actual or imminent. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Petitioners also must show the injury is "fairly traceable" to the respondent's action and this injury can be addressed through a favorable judicial decision. *Id.* Petitioners allege and establish such injuries which are fairly traceable to the BLM's ROD for the NPL Project and would be redressable by this Court. (*See* ECF No. 52 at 32; *see also* ECF No. 52-1; ECF No. 52-2; ECF No. 52-3; ECF No. 52-4.) Accordingly, the Court concludes Petitioners have standing to challenge this action.

## ANALYSIS

### 1. Pronghorn

26

a. **BLM Did Not Fail to Consider the Project's Impacts on the Path of the Pronghorn and Grand Teton National Park.**

Petitioners argue the Final EIS only included three sentences acknowledging the pronghorn "make some of the longest seasonal migration movements documented for the species." (ECF No. 52 at 36 (quoting BLM128611)). The EIS did not identify specific migratory routes, map out the winter ranges used by Herd 401, or analyze adverse effects of the project to Herd 401 and its migration routes. (ECF No. 52 at 36.) The BLM also failed to discuss the downstream, indirect effects of the loss of Herd 401. (*Id.* at 38.) The BLM was required to consider such effects under 40 C.F.R. § 1508.8.[16] Respondents argue the Path of the Pronghorn does not run through the NPL Project Area. (ECF No. 57 at 14 (citing BLM128611)). Furthermore, Petitioners cannot point to any ways a mandatory buffer zone alternative would have better protected migratory routes. (*Id.*) The BLM did briefly consider a wildlife and resource protection alternative but eliminated it from more detailed analysis. (*Id.*) The BLM also considered mitigation measures that were similar to Petitioners' proposed alternatives and considering these mitigation measures was sufficient. (*Id.* at 18.)

For the BLM's consideration of the significance of the Path of the Pronghorn to survive under the arbitrary and capricious standard, the BLM must have examined the relevant data and shown a rational connection between the facts, data, and the ultimate decision. *New Mexico ex rel. Richardson v. Bureau of Land Management*, 565 F.3d 683,

---

[16] 40 C.F.R. § 1508.8 is currently listed as "[reserved]" and has been listed as such since February 25, 2022, after the parties had submitted their briefs to the Court.

713 (10th Cir. 2009). "Under the arbitrary and capricious standard of review, this Court must give the Agencies' decision substantial deference." *Utahns for Better Transp. v. United States Dep't of Transp.*, 305 F.3d 1152, 1173 (10th Cir. 2002).

An agency is required to consider the future indirect impacts of a project in addition to direct impacts. *Custer County Action Ass'n v. Garvey*, 256 F.3d 1024, 1035 (10th Cir. 2001) (citing 40 C.F.R. § 1508.7).[17] NEPA only requires the agency put forth a reasonable, good faith, objective presentation of topics. *Utahns for Better Transp.*, 305 F.3d at 1174.

The EIS did consider the potential adverse impacts to pronghorn. The EIS considered the reduced viability of the pronghorn herd should pronghorn lose migratory routes or crucial winter range. (BLM128980.) The EIS acknowledged that pronghorn avoid highly developed areas but frequently utilize the Project Area, which is largely undeveloped at this time. (*Id.*) "Disrupted migration could prevent herds from reaching high quality forage . . . . [and] development in . . . migration routes could also eliminate the herd's migration memory[.]" (*Id.*) The EIS acknowledged the Proposed Action would likely displace or disrupt pronghorn populations. (*Id.*)

Petitioners argue the BLM did not analyze specific migratory routes used by Pronghorn throughout the Project Area. (ECF No. 52 at 36.) The BLM specifically differentiated between migration corridors and migration routes. (BLM129233.) The Final EIS points out there are no WGFD-designated pronghorn migration corridors in the NPL Project Area. (BLM128611.) This statement did not come from a lack of analysis, but

---

[17] 40 § C.F.R. § 1508.7 is also currently listed as "[reserved]" and the language quoted in Custer no longer explicitly exists.

rather from a recommendation submitted by the WGFD. (BLM076836.) As the State of Wyoming points out in its response brief, the WGFD requested the BLM not conflate routes and corridors. (ECF No. 58 at 30.) "While we appreciate the effort to protect migrating pronghorn, placing excessive protections on individual pronghorn migration routes may hamper our efforts to designate corridors elsewhere in the state that may be more important to pronghorn populations overall." (*Id.*)

The Final EIS followed the guidance of the WGFD—it did not fail to analyze specific migratory routes. NEPA requires the BLM to respond to comments made by other agencies. 40 C.F.R. § 1503.4. A response can include improving or modifying its original analysis. 40 C.F.R. § 1503.4(a)(3). The Final EIS responded to the WGFD by modifying its analysis to reflect the changes requested. This change does not indicate the BLM failed to consider the Path of the Pronghorn. The BLM simply took the recommendations of the WGFD. The BLM also acknowledged in the Final EIS that there were three pronghorn migration routes in the Project Area. This does not meet the standard for completely failing to consider an alternative under the arbitrary and capricious standard.

The Final EIS also considered indirect impacts on pronghorn, including "decreased or degraded seasonal habitats (including migration routes) that are important in supporting local and regional wildlife populations." (BLM128979.) It noted the degradation and disruption of migratory routes was of "particular concern" for pronghorn. (BLM129020.) The Final EIS was not required to use the specific term "Path of the Pronghorn" to demonstrate it adequately considered important migratory routes. *See Citizens for a Healthy Cmty v. United States Bureau of Land Management*, 377 F.Supp.3d 1223, 1235

(D. Colo. 2019). The BLM discussed the recorded pronghorn movement between Grand Teton National Park and the Upper Green River Basin in the Final EIS, but also found Grand Teton National Park pronghorn did not use winter ranges in the Project area. (BLM128611.) Additionally, the Final EIS acknowledged Highway 191, already located east of the Project Area, may be a complete barrier to migration on its own. (*Id.*) The Final EIS did not completely fail to consider the potential indirect impacts of the NPL project or loss of pronghorn migration.

The Final EIS mentioned several times that migration routes could face degradation or decreased use. (BLM128979.) This does not align with Tenth Circuit precedent in *Richardson*, where the public was not given any information on major impacts of an alternative. *See Richardson*, 565 F.3d at 708. The Final EIS informed the public that pronghorn migration could be drastically affected. The public had an opportunity to comment on this after the Final EIS was released. (BLM127870.) Petitioners' citation to expert research stating the Grand Teton pronghorn herd will certainly be eliminated if migration is obstructed (BLM078859) does not imply the BLM's analysis failed to completely consider an important aspect of the problem. *See Theodore Roosevelt Conservation Partnership v. Salazar*, 605 F.Supp.2d 263, 274 (D.C. Cir. 2009) (reminding counsel that the Court does not attempt to resolve conflicting scientific opinions).[18]

NEPA does not require the BLM to discuss all potential environmental impacts at length or in specific detail—it only requires the BLM consider all relevant factors and

---

[18] Petitioner cites other studies to show the potential negative impact of the NPL project on pronghorn migration, but no other study comes to such a drastic conclusion that the entire pronghorn herd could disappear. *See* BLM126616.

articulate a legitimate connection between the facts and the ultimate decision. *Diné Citizens Against Ruining Our Environment v. Bernhardt*, No. 1:19-CV-703, 2021 WL 3370899, at *5 (D.N.M. Aug. 3, 2021) (internal citations and quotations omitted). This Court's responsibility is to ensure the BLM took a "hard look" at the pronghorn migratory routes and any potential consequences to these routes as a result of the agency action. *Kleppe v. Sierra Club*, 427 U.S. 390, n. 21 (1976). The Final EIS discussed the potential loss of migratory routes in several places, not merely three sentences as Petitioners suggest.[19] The BLM sufficiently took a hard look and considered the impacts of potential migratory route degradation, including the Path of the Pronghorn.

### b. BLM Did Not Fail to Consider Reasonable Proposed Alternatives for Protection of Pronghorn Migratory Routes.

An environmental impact statement must provide a "full and fair discussion of significant environmental impacts and shall inform decision makers and the public of reasonable alternatives[.]" 40 C.F.R. § 1502.1. As part of this analysis, agencies must balance between evaluating alternatives in detail while still limiting their consideration to a reasonable number of alternatives. 40 C.F.R. § 1502.14.

When a court reviews the adequacy of alternatives given in an EIS, the court uses a "rule of reason." *High Country Conservation Advocates v. United States Forest Service*, 951 F.3d 1217, 1223 (10th Cir. 2020). This reasonableness standard examines both (1) the

---

[19] Petitioners argue the BLM cannot subsume the analysis of the Grand Teton Herd and the Path of the Pronghorn within the analysis of the Sublette Herd, and, at the very least, the EIS should have explained this approach. This is not the legal standard. The BLM is not required to individually analyze every possibly sub-herd—the BLM only needs to analyze the relevant data and analyzing the three migration corridors and the pronghorn population utilizing the Project Area is sufficient to show the BLM considered the relevant data. *Richardson*, 565 F.3d at 713.

alternatives the agency discusses and (2) the extent to which the agency discusses them. *Id.* An agency is not required to provide a detailed study of alternatives that are not reasonable. *Id.* Neither is an agency required to analyze alternatives if the alternative has been rejected in good faith as remote, speculative, impractical, or ineffective. *Id.* An agency is only required to consider multiple similar alternatives if they are significantly distinguishable from one another. *Id.*

This standard does not mandate the court come to a particular conclusion. *Greater Yellowstone Coalition v. Flowers*, 359 F.3d 1257, 1277 (10th Cir. 2004). The court only considers whether an agency's decisions were arbitrary. *Id.* The agency's decision is bound by reason and practicality. *Id.* (internal citations and quotations omitted). The court should only be concerned with whether the agency gathered sufficient information to decide on a reasoned choice of alternatives discussing environmental impacts. *Id.*

Petitioners assert the BLM should have evaluated an alternative with a "buffer zone" around pronghorn migratory routes. The BLM should have at least considered measures that "required avoidance of development within pronghorn migratory routes." (ECF No. 52 at 42.) Instead, the BLM authorized the project with only the mere possibility of voluntary migratory route protection. (*Id.* at 43.) The buffer zone alternative was a reasonable alternative, and the BLM should have included at least some analysis to comply with NEPA. Respondents disagree, stating "the range of alternatives was not unreasonably narrow because it considered alternatives that balanced the competing goals of governing RMPs." (ECF No. 58 at 43.) Respondent Jonah Energy referenced the "lengthy list" of studies the BLM considered to evaluate the effect on the pronghorn. (*Id.* at 31.) This

included consulting with WGFD and considering the potential impacts on Herd 401. (*Id.* at 31–33.) Even if Petitioners do not approve of the result, it doesn't negate the BLM's "hard look" at these issues. (*Id.* at 37.) NEPA does not mandate certain results, yet Petitioners only challenge the substance of the decision. (*Id.*)

The Biodiversity Conservation Alliance submitted a public comment, asking the BLM to consider a two-mile buffer around pronghorn migration corridors in the Project Area. (BLM079469.) The BLM did not directly address a buffer zone alternative in the Final EIS. (*See* BLM128201.) However, the BLM did address this comment on the record. (BLM127599.)[20] The Western Watersheds Project also submitted a comment requesting a one-mile buffer around the narrower pronghorn migration pathway. (BLM127535.) The BLM eliminated this alternative because it was substantially similar to Alternative A, considered in detail to address sensitive wildlife concerns. Additionally, the BLM considered but eliminated a wildlife resource and protection alternative, discussed in both the Draft and Final EIS. (BLM127525; BLM128201.) The BLM noted the comments raising concern over migratory routes in the ROD. (BLM127870.) The BLM did not completely fail to address this "proposed 'middle ground' alternative[.]" (ECF No. 52 at 44.)

When a considered alternative includes aspects of a suggested action, the BLM does not need to consider the suggestions as distinct alternative approaches. *Citizens for a*

---

[20] Petitioners argue Respondents attempt to use post-hoc rationalization for rejecting a buffer zone by citing to Alternative A and the Wildlife Resource and Protection Alternative, because neither of these alternatives explicitly mention a buffer zone. (ECF No. 62 at 15.) The BLM's response to the buffer zone comment on the record upends this argument—BLM gave the same rationalization before issuing the ROD.

*Healthy Cmty.*, 377 F.Supp.3d at 1235. Petitioners here have not shown explicitly incorporating a buffer zone was significantly different from Alternative A or the wildlife resource and protection alternative. Pronghorn were designated as a "focus species" in Alternative A, meaning the BLM would implement more resource protection measures for pronghorn in that scenario. (BLM128340–41.) Under this alternative, density of development would be reduced overall to protect big game. (BLM128343.) The BLM also acknowledged the pronghorn migration corridor as a "sensitive biological resource" in the ROD Appendices and stated the corridors will be avoided to minimize disturbance. (BLM128045.)

Petitioners contend the BLM was required by the Pinedale and Green River RMP's to include buffer zones, but the RMP's are not so specific. (ECF No. 52 at 46.) Both RMPs merely require any projects to protect big game migration. (BLM133285; BLM132624.) The Pinedale RMP explicitly states the magnitude of impacts required to protect migratory routes could differ based on the project. (BLM133285.) The protection measures could range from project relocation to seasonal timing limitations. (*Id.*) Nowhere in the Pinedale RMP are buffer zones around migratory routes mandatory. At most, the Pinedale RMP prohibits surface occupancy along big game migration routes and bottlenecks "unless other restrictions were applied[.]" (BLM132818.) Likewise, the Green River RMP only mandates reducing habitat loss by applying appropriate restrictions. (BLM132624.) The Green River RMP does not mandate any specific restrictions to preserve big game migratory routes, including buffer zones. (BLM132657.) (BLM127835–36.) There is no

indication the BLM failed to comply with the Pinedale or Green River RMP. In fact, the ROD explicitly states the NPL Project must comply with both RMPs. (BLM127836.)

The ROD also stated Jonah Energy would work with BLM and WGFD to understand and potentially preserve migration routes in the Project Area. (BLM127897.) Petitioners argue these resource protection measures are "illusory" but the Court disagrees. (ECF No. 52 at 43.) The Record of Decision sets forth restrictions to protect big game, including limiting development density in different DAs within the Project Area and requiring site-specific BLM approval before any project-related operations. Petitioners assert the ROD only prevents Jonah Energy from physically blocking migration routes, but not necessarily narrowing or impeding the same. (ECF No. 62 at 18.) Petitioners dissect the wording of the ROD, arguing preventing barriers is not the same as preserving migration routes to prevent displacement. (*Id.*) This argument is unconvincing. Parsing words and sentences does not create a problem with the BLM's chosen alternatives. The BLM properly considered several alternatives and mitigation measure to preserve migratory routes.

Based on the wildlife prevention measures considered in Alternative A and the protection measures implemented in the ROD, there is no indication BLM acted arbitrarily or capriciously when it did not consider a buffer zone alternative. The BLM specifically addressed this public comment, finding it was similar to other analyzed alternatives. The only evidence petitioners offer to support their contentions is that the Final EIS never explicitly discussed buffer zones around migratory routes. The omission of one very specific protective measure from the EIS does not show the BLM wholly failed to consider

a reasonable alternative. *See* 40 C.F.R. § 1502.14(f). "An agency need not include an infinite range of alternatives, but is required to cover those which are feasible and briefly explain why other alternatives, not discussed, have been eliminated. *Middle Rio Grande Conservancy Dist. v. Babbitt*, 206 F.Supp.2d 1156, 1175 (D.N.M. 2000) (citing 40 C.F.R. § 1502.14). The agency's failure to specifically discuss buffer zones around migratory routes was a reasonable decision considering the detailed analysis of Alternative A. The BLM's lack of discussion of buffer zones does not render its decision arbitrary or capricious.

### 2. Greater Sage Grouse

#### a. Petitioners Properly Raised Their Concerns About the Sage Grouse in the Public Comment Period.

The BLM argues Petitioners did not make a specific public comment about conducting additional studies in the WCAs. (ECF No. 57 at 22–23.) Since the BLM did not have an opportunity to review and respond to a comment during the administrative process, Petitioners are barred from asserting this claim to the Court. (*Id.*) The BLM also argues Petitioners' comments never raised the issue of phased development in order to comply with FLPMA, so Petitioners should also be prohibited from raising the issue now. (ECF No. 57 at 25.)

Jonah echoes this argument, stating Petitioners did not advance either of the greater sage grouse arguments now before the Court and Petitioners should not now be allowed to assert technical issues such as violations of NEPA and FLPMA. (ECF No. 59 at 25.) No organization raised concerns during the public comment period that 40 C.F.R. § 1502.22

36

required BLM to acquire additional data before issuing the ROD. (*Id.*) Likewise, Petitioners did not assert the ROD would violate the 2015 Sage Grouse RMP. (*Id.*)

Petitioners' challenge the BLM's compliance with NEPA, but in order to bring this claim in federal court, Petitioners must have exhausted available administrative remedies. *Ark Initiative v. United States Forest Service*, 660 F.3d 1256, 1261 (10th Cir. 2011). Any relevant objections must usually be raised during the public comment period. *Sierra Club, Inc. v. Bostick*, 787 F.3d 1043, 1048 (10th Cir. 2015). However, there are two exceptions: (1) where commenters need not point out an environmental assessment's "obvious" flaw; and (2) a commenter does not waive an issue if it is otherwise brought to the agency's attention. *Id.*

The comment must have been presented in sufficient detail so the agency can take steps to address the complaint. *Ark Initiative*, 660 F.3d at 1261. However, claimants are not required to use precise legal formulations or magic words when raising claims. *Jarita Mesa Livestock Grazing Ass'n v. United States Forest Service*, 140 F.Supp.3d 1123, 1185 (D.N.M. 2015).

The National Audubon Society submitted a comment explicitly asking the BLM to follow 40 C.F.R. § 1502.22. (BLM076911.) This comment also stated a failure to evaluate complete data on WCAs would violate NEPA. (*Id.*) The National Wildlife Federation submitted a comment requesting the BLM conduct additional research on WCAs before issuing drilling permits and expressing concern over the lack of research available, despite development being allowed under Alternative B. (BLM076985.) This comment echoed the requirement that the agency follow 40 C.F.R. § 1502.22. (*Id.*) These comments are

sufficient to raise the issue of conducting additional research in WCAs before permitting development. Petitioners have exhausted their administrative remedies on this issue.

Turning to whether Petitioners sufficiently raised the FLPMA violation claims during the administrative process, Petitioners claim they are not required to raise this issue because it falls under the "obvious" exception to exhaustion of administrative remedies. (ECF No. 62 at 26.) When an EIS's flaws are so obvious, there is no need for a commentator to point them out. *Dep't of Trans. V. Public Citizen*, 541 U.S. 752, 765 (2004). The BLM was aware it needed to comply with the resource design features of the 2015 Sage Grouse RMP. (BLM015436; BLM015450.) Jonah Energy and the BLM worked together to discuss phased development, to ensure compliance with the RMPs. (BLM015450.) The BLM later discussed removing the phased development plan as "discretionary" in an email. (BLM015699.) The BLM was already aware of the need to comply with FLPMA and contemplated this independently. There was no need for Petitioners to specifically raise the issue of FLPMA compliance. Petitioners' comment on this issue would not have served any purpose—the BLM was already aware the project needed to comply with the RMP and was working towards that goal. The Court finds Petitioners meet the exception to administrative exhaustion and the FLPMA compliance issues are properly before this Court.

### b. BLM Did Take a Hard Look at the NPL Project's Impacts on Sage Grouse Populations.

NEPA requires federal agencies to "take a hard look" at the environmental consequences of the proposed actions. *Pennaco Energy, Inc. v. United States Dep't of*

*Interior*, 377 F.3d 1147, 1150 (10th Cir. 2004). The standard only requires the agency to adequately identify and evaluate environmental concerns—beyond this, agencies are not required to take any further action. *Id.* To meet this standard, the agency must prepare an EIS, comparing the environmental impact of the proposed action to impacts of alternatives. 42 U.S.C § 4332(C).

Petitioners contend the BLM failed to obtain baseline data on WCAs. (ECF No. 52 at 49.) The BLM recognized significant gaps in available research on sage-grouse use of WCAs in the Project Area but declined to gather this data before issuing the ROD. (*Id.* at 50.) The BLM plans to conduct these studies concurrently with NPL project development, rather than assessing impacts to sage grouse beforehand. (*Id.*) Instead, the Project itself will be used to test the effects of development on sage grouse. (*Id.* at 52 (citing BLM128346)). Respondents contest this rendition of the facts, stating Petitioners ignore that, under any proposed alternative, the BLM would not authorize development in WCAs until additional research has been conducted to better understand potential effects on sage grouse. (ECF No. 57 at 19 (citing BLM128994). The Final EIS summarizes available research on WCAs but restricts any further development until more studies are conducted. (*Id.* at 20.) This site-specific authorization requirement satisfies NEPA and further analysis before issuing a decision is not required by the law. (*Id.* at 21 (citing *Sierra Club v. Robertson*, 810 F. Supp. 1021, 1030 (W.D. Ark. 1992)).

Federal regulations specify how an agency should proceed when faced with incomplete or unavailable information. 40 C.F.R. § 1502.21. The agency must make it clear that the information is lacking. § 1502.21(a). If the incomplete information is essential to

a reasoned choice among alternatives, and the overall costs to obtain the information is not unreasonable, the agency should collect the data and include it in the EIS. § 1502.21(b). If the information is not obtainable because of exorbitant cost or the agency is not able to collect the data, the agency must include in the EIS: (1) a statement that the information is incomplete or unavailable; (2) a statement of the relevance of the incomplete or unavailable information; (3) a summary of existing credible scientific evidence that is relevant to evaluating the reasonable foreseeable impacts of the project; and (4) the agency's evaluation of such impacts based on the available data. § 1502.21(c).

To demonstrate a violation of NEPA, based on failure to include data, Petitioners must show (1) the missing information is essential to a reasoned decision between the alternatives; and (2) that the public was unaware of the limitations of the data the agency did rely on. *Trout Unlimited v. United States Dep't of Agriculture*, 320 F.Supp.2d 1090, 1111 (D. Colo. 2004) (citing *Colo. Env't Coalition v. Dombeck*, 185 F.3d 1162, 1172–73 (10th Cir. 1999)). Petitioners argue the missing data was essential to a reasoned decision, because WCAs are important to maintaining sustainable sage grouse populations and have a high conservation value. (ECF No. 52 at 55.) Other studies indicate development in WCAs has a high risk of sage grouse population decline (*Id.* at 56.) Without the baseline data on WCAs, the BLM could not comprehend the potential for sage grouse population loss. (*Id.*)

The Court disagrees that this information was essential to reasoned decision making. The BLM acknowledged in the Final EIS "the potential impacts on sage-grouse resulting from development in the NPL Project Area Winter Concentration Areas are not well

understood." (BLM128302.) However, the BLM did have the benefit of reviewing the 2015 RMP, which discussed WCAs as a PHMA. (BLM053417.) The 2015 RMP imposes seasonal timing restrictions on development in WCAs (BLM053195) and allows the BLM to grant exceptions to the restrictions if the BLM and WGFD determine the exception would not adversely impact the population being protected (BLM053286). The BLM did not allow development in WCAs without baseline data, but instead relied upon the 2015 RMP. The ROD authorizes limited development in WCAs with seasonal timing limitations, in accordance with the 2015 RMP. (BLM 127844; BLM053441); *see Trout Unlimited*, 320 F.Supp.2d at 1111 (using other analyses to inform decision when data was limited was sufficient to satisfy NEPA requirements).

Additionally, the BLM explicitly states, under any alternative, no development will be authorized in WCAs "until additional research is conducted to better inform the appropriate level of development, potential impacts, and appropriate mitigation in sage-grouse winter concentration areas." (BLM128994.) The BLM reiterates in the ROD that the study will inform which WCA development scenario proceeds. (BLM127843.) The BLM initially authorized Scenario 1, but the results of the study may affect this, and the BLM reserves the right to switch to Scenario 2. (BLM127844.) BLM also had some baseline data, although minimal, from the "flight day" studies. (BLM128627.)

Furthermore, it does not appear the baseline data is necessary for the BLM to make an informed decision. While Petitioners contend it was necessary to determine the effects of development on WCAs, it appears the BLM is already aware of the effects. The Final EIS notes sage grouse are susceptible to loss of winter habitat from the NPL Project as

proposed. (BLM128991.) It also notes the sage-grouse are likely to suffer decreased quality of habitat following surface disturbance. (*Id.*) The Final EIS recognizes "recent studies shows oil and gas development can affect sage grouse during their entire life cycle and can contribute to displacement of sage-grouse from [these areas]." (BLM128992.) The Final EIS notes any increased development could negatively affect the sage grouse population. (BLM128993.)

Looking at WCAs specifically, the Final EIS acknowledged the Proposed Action would have short-term and long-term effects on WCAs, partially because WCAs are authorized at a higher development density than PHMAs. (BBLM128993.) The Final EIS reiterates sage grouse populations could face similar displacement under Alternative B, Scenario 1, although the effects may be slightly less drastic because this Alternative would be a 7.9% decrease in surface disturbance compared to the proposed action. (BLM129033.) It does not appear more baseline data is necessary for the BLM to evaluate the impacts of the project on sage grouse. The Final EIS indicates the BLM was aware of the impacts to sage grouse, including loss of winter habitat, avoidance of the area, and adverse impacts to the overall population. (BLM128995.) NEPA only prohibits uniformed, rather than unwise decision making. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989). The BLM made an informed decision based on the available data.

Petitioners do not show how baseline data was essential to a reasoned decision.[21] Accordingly, Petitioners' arguments on this claim fail. *Dombeck*, 185 F.3d at 1173 (holding the plaintiffs failed to show how additional, site specific data was essential to a reasoned decision, where the agency was aware of the scarcity of data and used relevant, available information to come to its final decision); *Trout Unlimited*, 320 F.Supp.2d. at 1111 (holding the agency complied with NEPA when plaintiffs could not show the missing information was necessary to a reasoned decision); *High Country Conservation Advocates v. United States Forest Service*, 52 F.Supp.3d 1174, 1194 (D. Colo. 2014); *Rags Over the Arkansas River, Inc. v. Bureau of Land Management*, 77 F.Supp.3d 1038, 1049 (D. Colo. 2015).

### c.  BLM Did Not Violate FLPMA by Failing to Comply with the 2015 Sage Grouse RMP.

Finally, Petitioners argue the BLM failed to comply with FLPMA because the ROD did not follow the 2015 Sage Grouse RMP. (ECF No. 52 at 58.) The Federal Land Policy and Management Act requires BLM actions to conform with Resource Management Plans. 43 C.F.R. § 1610.5-3(a). The 2015 RMP requires any development within PHMAs to implement a phased approach to development—this is a required design feature ("RDF") for any oil and gas projects in the habitat. (ECF No. 52 at 58 (citing BLM139504)). RDFs

---

[21] Petitioners cite to a case from the Ninth Circuit where the court held baseline data on sage grouse was necessary for a complete EIS. *Plains Resource Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1084–86 (9th Cir. 2011). The case is not binding precedent on this Court. Regardless, the case is further distinguishable because the only data collected on sage grouse was the total acreage of sage grouse habitat within the project area. *Id.* at 1084. Here, the BLM had much more data to rely on when making a decision, including maps of sage-grouse PMHA, WCAs, and other sage grouse habitat not specifically designated by WGFD but known to be used by sage grouse. (*See e.g.,* BLM128994.) The BLM here relied on substantially more data than the Board in *Plains Resource Council*.

are required for activities within sage grouse habitat, unless the NEPA analysis shows a specific RDF is not applicable to site-specific conditions of the project or an alternative RDF or other conservation measure will provide equal or better protection to sage grouse and sage grouse habitat. (BLM139502.)

Respondents counter this, arguing despite Petitioners' contentions, the BLM did consider a phased development approach but properly rejected the alternative. (ECF No. 58 at 59.) Under the 2015 RMP, the BLM did not need to implement phased development if analysis showed there were better site-specific conditions. (*Id* at 60. (citing BLM139502)). This action is also consistent with FLPMA. (*Id.*) The BLM considered phased development in Alternative A but ultimately chose Alternative B because it more closely aligned with the purpose and needs of the project. (*Id.* at 58.) Besides the options discussed in Alternative A and B, the BLM also considered a paced development option, but eliminated this from consideration early because it was not technically or economically feasible. (*Id.* at 62.)

The ROD is very clear that site-specific permitting will begin once Jonah Energy identifies the precise locations of the proposed wells. (BLM127835; BLM127860.) Once Jonah requests the site-specific permits, the BLM will conduct a site-specific environmental review. (BLM127836.) "Some resource protection measures will be included as COAs during permitting for site-specific development of the NPL Project, as applicable[.]" (BLM127854.) Discussing sage grouse habitat specifically, the ROD notes the BLM will make site-specific determinations to appropriately mitigate impacts to sage

grouse. (BLM127859.) The BLM committed to apply RDFs from the 2015 RMP as applicable. (BLM127899.)

The BLM also recognized several variables affect the project beyond the BLM's control, namely: "production success, appropriate engineering technology, economic factors, commodity processes, availability of commodity markets, the availability of appropriate equipment, and a trained workforce, and regulatory constraints[.]" (BLM128308.) This falls under the first exception to implementing RDFs—when "a specific RDF is documented not to be applicable to the site-specific conditions of the project/activity (e.g., due to site limitations or engineering considerations)." (BLM053287.) Phased development was considered as a part of Alternative A (BLM128655) but rejected because of these constraints (*See* BLM127865) ("[Alternative B] will allow development on valid existing leases throughout the NPL Project Area and will best meet *the purpose and needs of the project*") (emphasis added).

The BLM considered phased development but the decision to reject Alternative A in favor of Alternative B was not contrary to the RMP or FLPMA.[22] The RMP acknowledges this type of situation where RDFs may not be applicable until site specific determinations. (BLM053287.) After site specific analysis, some RDFs may not even be applicable. The BLM has not analyzed site-specific constraints on this project yet and will

---

[22] The District of Idaho considered the sister case to this action in *Western Watersheds Project v. Bernhardt*, 543 F.Supp.3d 958 (D. Idaho 2021) *appeal docketed*, No. 21-35673 (9th Cir. Aug. 17, 2021). There, the magistrate judge held the BLM did act arbitrarily and capriciously by rejecting plaintiff's proposed alternatives requesting deferral of parcels designated as PHMA for sage grouse. *Id.* at 983. The BLM only considered two alternatives: the no action alternative and the proposed action. *Id.* at 982. The magistrate judge further found BLM failed to provide adequate explanation for the rejection of the proposed alternative. *Id.* at 984. This is distinguishable from the case here, where the BLM considered four potential alternatives and gave sufficient detail in the Final EIS and ROD detailing why phased development was ultimately rejected.

not do so until Jonah submits permit applications for precise drill site locations. (BLM127836.) The RMP contemplates such a situation where site-specific decisions may affect certain RDF applicability. (BLM053287.) The BLM complied with FLPMA and the RMP in deciding on Alternative B. *See Oregon Natural Desert Ass'n v. Shuford*, No. 06-242, 2007 WL 1695162, at \*13 (D. Oregon June 8, 2007) (holding the BLM was not required to analyze alternatives under the RMP when such alternatives would not be feasible or consistent with the BLM's management duties); *Theodore Roosevelt Conservation Partnership v. Salazar*, 616 F.3d 497, 510 (D.C. Cir. 2010) (holding there was no FLPMA violation where the BLM reasonably decided the proposed development encompassed the RMP requirements); *Cascadia Wildlands v. Bureau of Land Management*, 4410 F.Supp.3d 1146, 1155 (D. Oregon) (upholding BLM action where it was not "plainly inconsistent" with governing RMPs).

### CONCLUSION

Based upon a complete review of the administrative record in this matter, there is substantial evidence to support the reasoned basis for BLM's decisions in this matter. The BLM took a "hard look" at the environmental consequence and considered all relevant information when making its ROD and deciding the best alternative to balance the goals of the NPL Project and the potential environmental impacts. Petitioners have not demonstrated the BLM's decision to approve Alternative B for the NPL Project violated NEPA, was arbitrary or capricious, or was otherwise contrary to law.

**IT IS THEREFORE ORDERED** that the BLM's Record of Decision on the Normally Pressured Lance Project is **AFFIRMED**.

Dated this _5_ day of April, 2022.

Scott W. Skavdahl
United States District Judge